# Wytheville

ALLEN'S EXECUTRIX v. VIRGINIA TRUST CO. AND OTHERS

### June 11, 1914.

1. EXECUTORS AND ADMINISTRATORS — *Commissions—Stocks and Bonds Distributed.*—An executor, in this State, is generally entitled to a commission of five *per cent.* on receipts which may be reduced or increased under peculiar circumstances, and this allowance extends to stocks and bonds distributed in kind.

2. BROKERS—*Margins—Validity of Contract.*—The word "margin" signifies money or other property deposited with a broker by his customer to secure the broker against loss by reason of fluctuations in the market price of the commodity sold. If the parties mutually understand and intend that the buyer is to pay for and the seller is to deliver the commodity at the maturity of the contract, it is a valid and legal transaction, and the fact that either party is required to put up a margin and increase it from time to time, if need be, in order to secure the performance of the contract, does not vitiate the contract.

3. BROKERS — *Margins—Validity—Presumption.*—If any presumption is to be indulged from the bare fact that stocks were purchased on margin, it will be in favor of the validity and legality of the contract.

4. EXECUTORS AND ADMINISTRATORS—*Commissions—Stocks in Pledge.*— Where a decedent has purchased stocks in his lifetime, which, at the time of his death, are held by a broker as a security for money, whether as a loan, or as a margin on the stock, his personal representative has the right to pay off the debt so secured, and, if he does so, is entitled to the usual commission on the full value of the stock, and is not restricted to a commission on the net value after deducting the debt secured. It might be different if the stock were sold subject to the pledge.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for the defendants. Complainant appeals.

*Reversed.*

The opinion states the case.

*Wellford & Taylor,* for the appellant.

*Daniel Grinnan* and *Christian, Gordon & Christian,* for the appellees.

KEITH, P., delivered the opinion of the court.

This suit was brought in the Chancery Court of the city of Richmond to settle up the estate, real and personal, of Otway S. Allen, deceased. All proper parties being made, such proceedings were had that the estate was distributed to the satisfaction of the devisees and legatees under his will, with the exception of his executrix, who complains that the decree denied to her certain commissions to which she claims she was entitled.

The cause was referred to a commissioner to settle the accounts of the executrix, and he returned a report from which it appears that the gross value of the personal estate is $105,730, consisting of stocks and bonds. To this report the parties in interest adverse to the executrix excepted, because a commission of five *per cent.* or any commission, was allowed on stocks and bonds to the amount of $57,102 which were distributed in kind among the parties entitled thereto, and to so much of the report as allows a commission of five *per cent.* on the sum of $35,701.11, being the amount of money paid to Branch, Cabell & Co. by the executrix in full satisfaction of the amount due on five hundred shares of stock of the Pennsylvania Railroad Company and one hundred shares of stock of the Chesapeake and Ohio Railway Company, which had been purchased by Otway S. Allen, deceased, during his lifetime, and on which a balance was due at the time of his death.

The court overruled the first exception and maintained the right of the executrix to a commission of five *per cent.* on the stocks and bonds distributed in kind; and in this we think there was no error. A long line of decisions in this State, beginning with *Granberry* v. *Granberry,* 1Wash. (1 Va.) 246, fixes a commission of five *per cent.* on receipts as the usual allowance, which may be reduced or increased under peculiar circumstances. 4 Min. Inst., Pt. 2, p. 1487; *Darling* v. *Cumming,* 111 Va. 637, 69 S. E. 940; 2 Lom. Ex'ors. 329.

The court very properly overruled the first exception, but sustained the second; and thereupon an appeal was allowed the executrix.

At the time of the testator's death there were in the hands of Branch, Cabell & Co., brokers, five hundred shares of Pennsylvania Railroad Company stock of the par value of $50, one hundred shares of the stock of the Chesapeake and Ohio Railway Company of the par value of $100 each, and one hundred and twenty-eight shares of the stock of 'the Clifton Forge Light and Water Company of the par value of $25. There was due upon this stock to Branch, Cabell & Co. the sum of $35,300.08. The report of the commissioner allows five *per cent.* to the executrix upon the value of the stock, while the contention of appellees is that from the value of the stock $35,300.08 should have been deducted and a commission allowed upon the residue.

The chancery court was of opinion that this transaction grew out of the purchase of the stocks upon a margin, and seems in some measure to rest its conclusion denying the commission upon that fact. All that appears from the record is that the stocks were in the hands of Branch, Cabell & Co., and that there was due upon them the sum above named of thirty-five thousand dollars.

We do not deem it material to conjecture as to the cir-

cumstances attending this transaction, for if it were conceded to be a purchase of stocks upon a margin, that fact standing alone would have no controlling effect.

In Elliott on Contracts, section 1002, it is said: "The word 'margin' signifies money or other property deposited with a broker by his customer to secure the broker against loss, by reason of fluctuations in the market price of the commodity purchased or sold. It is held, with few exceptions, that a speculative transaction for the purchase and sale of stock or other commodity on margins does not constitute gambling."

And in section 1003 the same author says: "The same test is applied here as in other transactions in futures. If the parties mutually understood and intended that the purchaser should pay for and the seller should deliver the commodity at the maturity of the contract, it is a legal and valid transaction; and the fact that the purchaser is required to deposit a margin and increase the same at any time the market requires it in order to insure payment of the market price at the maturity of the contract, and thus insure the broker against loss, or that the seller shall deposit a margin and increase the same as the market shall require in order to make sure delivery at maturity of the commodity sold, does not vitiate the contract."

There is nothing before us but the bare fact, as we have stated, and if a presumption is to be indulged that presumption will be in favor of the validity and legality of the contract. Whether the decedent was the complete owner of the stocks in question, and deposited the same as security for a loan, or whether the transaction was one in which the broker had bought these stocks upon a margin, and the stocks themselves were held as security for the ultimate payment of the purchase price, is we think immaterial to the question at issue. It is some-

what analagous to the case of *Exposition Arcade Corp.*
v. *Lit Bros.,* 113 Va. 574, 75 S. E. 117, where goods were
delivered to the buyer but title was retained by the seller
until the price was paid, and it was held, upon the au-
thority of *Chicago Equipment Co.* v. *Merchants' Bank,*
136 U. S. 268, 10 Sup. Ct. 999, 34 L. Ed. 349, that the
transaction was in legal effect the same as if the buyer
had obtained title from the seller and had given back a
mortgage to secure the purchase price.    Mr. Justice
Harlan, in the case from 136 U. S. says, that "The
agreement that the title should remain in the payee un-
til the notes were paid   .    .    .   is a short form of chat-
tel mortgage.    The transaction is, in legal effect, what it
would have been if the maker, who purchased the cars,
had given a mortgage back to the payee, securing the
notes on the property until they were all fully paid."

In *re Bolles,* 124 N. Y. Supp. 620, it appears that "the
accounting executors found upon taking office that their
testator had pledged certain securities, in one case to a
bank to secure a loan made to him by the bank, and in
another to a firm of stockbrokers to secure to them the
repayment of sums advanced by them in the purchase of
securities on margin for his account.    The executors
directed the bank, as well as the brokers, to sell the se-
curities thus held by them, respectively; and upon the
sale so directed there was paid to the executors by the
pledgees the difference between the proceeds of sale and
the sums which the decedent's estate owed to the pledg-
ees.    The sum realized from the sales was $117,345, the
amount of the indebtedness of the estate was $97,446.07,
and the balance paid to the executors was $19,898.93. Are
the executors' commissions to be calculated upon the pro-
ceeds of sale, or upon the sum received by them in settle-
ment with the pledgees?    The transactions of the dece-
dent have been 'pledges,' for they could have no other

name or nature. No one will doubt that the contract with the bank was a pledge, and it is equally plain, upon authority, that the arrangement with the brokers was of the same character. . . . Hence the decedent retained ownership of the securities, his representatives succeeded to that ownership, and his estate was indebted to the pledgees in the sums for which they held the obligations of the deceased. Under every view which the quality of a pledge permits, the executors receive the gross proceeds of sale, and must have commissions thereon, when the subject of the pledge has been sold by their directions and their debt has been paid from the proceeds. The pledgees made these sales, not in the exercise of the right of disposition secured to them by the contract of pledge, but solely as the agents of the executors; and their custody of the proceeds at the moment of their application to the debts, respectively, was the possession of their principals."

In *Content* v. *Banner*, 184 N. Y. 121, 76 N. E. 913, 6 Am. Cas. 106, it is said, that "Where a stockbroker buys securities for a customer, although he advances the whole amount necessary for the purchase, instead of requiring a margin, the relation of pledgee and pledgor exists between the parties; and a sale of the securities by the broker without notice of the time and place of sale, constitutes a conversion, in the absence of an agreement dispensing with such notice or providing for otherwise disposing. of them." Se also *Miller & Co.* v. *Lyons*, 113 Va. 275, 74 S. E. 194; *Estate of Pease*, 149 Cal. 167, 85 Pac. 149; *Elder* v. *Whittemore*, 51 Ill. App. 662; *Huddleston* v. *Kempner*, 87 Tex. 372, 28 S. W. 936.

It cannot be doubted that the estate of the decedent was indebted to the firm of Branch, Cabell & Co.; that these stocks were held by the brokers as pledges to secure the payment of that debt; and we think it clear that the

executrix had a right to pay the debt for which it was held in pledge. Under the advice of counsel the executrix borrowed money, paid the debt to Branch, Cabell & Co. and distributed the stocks held by them in kind among those entitled. Upon the value of the stocks so distributed she had a right to charge commissions, as we have already held, unless the fact that the stocks were held in pledge is to be considered as a controlling consideration to the contrary, a view which we have already sufficiently considered. It may be true that she could have sold the stock subject to the pledge, and if that course had been pursued it may be conceded that she would not have been entitled to commissions; but if the course which she pursued was a lawful one, we do not think it follows that she should be deprived of her compensation.

For these reasons we are of opinion that the decree complained of is erroneous and should be reversed, and the cause remanded to the chancery court for further proceedings not in conflict with the views expressed in this opinion.

*Reversed.*