# Richmond.

## Lucy G. Trotman, et als. v. Harry L. Trotman, Administrator, etc.

### September 29, 1927.

1. Executors and Administrators—*Commissions—Agreement to Waive Commissions—Finding of Master—Case at Bar.*—In the instant case the widow of decedent contended that the administrator of decedent agreed to waive his right to commissions in consideration of her waiving her right to qualify as administratrix in favor of the administrator. The master in chancery found that there was no agreement to waive commissions. There was some conflict in the evidence, but the master heard the testimony, and his findings met with the approval of the chancellor in the court below.

    *Held:* That the master's finding that there was no agreement would not be disturbed on appeal.

2. Master in Chancery—*Report of Commissioner—Errors not Apparent on the Record.*—The report of a master in chancery, except as to errors apparent on its face, is *prima facie* correct, and where the evidence is conflicting, the appellate court will not reverse the action of the trial court overruling the exceptions to the report and confirming it, unless the findings of the commissioner are clearly erroneous.

3. Master in Chancery—*Report of Commissioner—Exceptions to Report.*—The exceptions to the report partake of the nature of special demurrers, and serve to direct the attention of the court with reasonable certainty, to a specific point in controversy.

4. Master in Chancery—*Report of Commissioner—Exceptions to Report—Exception not Made in the Court Below.*—It is too late on appeal to raise an objection to the report of a master in chancery where no exception was taken in the court below.

5. Executors and Administrators—*Commissions—Amount of Commissions—What to be Considered.*—In determining the amount of commissions which a personal representative is entitled to under Code of 1919, section 5425, the value of the estate, the character of the work, the difficulties encountered, and the results obtained must all be remembered in reaching a judgment, and the report of the commissioner must stand unless it is erroneous on its face.

6. EXECUTORS AND ADMINISTRATORS—*Commissions—Amount of Commissions—Allowance of Five Per Cent on Large Estate where the Work of the Administrator was Exceptional—Case at Bar.*—In the instant case the administrator of a large estate had to adjust disputed claims in wide variety; carry out farm operations far in excess of what any ordinary administrator could have been called upon to perform, and stipulation of counsel showed that extra payment for this work was contemplated; registered government bonds were converted to those that passed by delivery; and a store of decedent had to be closed out and the accounts collected. These and other matters were presented to the commissioner, and to his finding on the issue of the amount of commissions to which the administrator was entitled there was no exception.

   *Held:* That an allowance to the administrator under these circumstances of five per cent commission was not unreasonable under section 5425 of the Code of 1919.

7. ADVANCEMENTS—*Presumption in Favor of Advancement—Intention of Donor.*—It is the settled law of this State that a free gift from a father to a son is presumed to be an advancement, but this presumption is not conclusive, and is always governed by the intention of the donor. A father may give his property in absolute estate to a child or to a stranger.

8. ADVANCEMENTS—*Report of Master—Presumption in Favor of Report.*—Where a master in chancery found that gifts of a father to two of his sons were not advancements but free gifts, and the finding of the master was approved by his chancellor, the correctness of the master's conclusion is strongly to be presumed.

9. ADVANCEMENTS—*Intention of Donor—How Ascertained.*—To ascertain the intention of an intestate as to whether a gift to a child was a free gift or an advancement, the circumstances of the gift must first be looked to and next the declaration or declarations of the decedent.

10. ADVANCEMENTS—*Rebuttal of Presumption—Case at Bar.*—In the instant case a father contemplating a second marriage gave to his grown sons two farms. The father possessed a large estate to which the sons and their mother had contributed largely. Several witnesses testified that the father had declared that he wanted the sons to have the farms extra and that there would be enough left to divide.

    *Held:* That this evidence amply sustained the finding of the commissioner that the conveyances of the farms to the sons were free gifts and not advancements.

11. ADVANCEMENTS—*Intention—Circumstances and Relations Between Father and Child.*—The circumstances and relations between a father and his child are properly admitted as evidence upon the general question of whether a gift is to be considered as an advancement.

12. STARE DECISIS—*Opinions of Courts—Construction of Opinions.*—Opinions
    of courts, to be correctly understood, should always be read in the
    light of the facts of the case in which they are rendered.

Appeal from a decree of the Circuit Court of Norfolk
county.   Decree for complainant.   Defendants appeal.

*Affirmed.*

The opinion states the case.

*David Meade White*, for the appellants.

*Goodrich Hatton*, for the appellees.

HOLT, J., delivered the opinion of the court.

Thomas E. Trotman, a prominent citizen of Nanse-
mond county, and then about sixty-seven years old,
was killed on May 15, 1923, in a crossing accident.   He
died intestate.   There were two children of a first
marriage, Harry L. and Percy E. Trotman.   They
were around forty years old, and had themselves
children nearly grown.   The first wife had been dead
several years.   Through industry and cordial coopera-
tion she had contributed materially to the large estate
left by her husband.   On September 10, 1921, Thomas
E. Trotman married Lucy Gardner, his widow now
surviving.   There was born of this marriage the infant
defendant Helen Gardner Trotman, who at her father's
death was only a few months old.   Mr. Trotman was a
"truck farmer."   He had in cultivation nine farms, and
tilled more than two thousand acres.   Some idea of the
extent of his operations is conveyed by the fact that
his administrator during the year of his death realized
therefrom $147,235.82.   He also ran a country store,

and had many other interests. His death, which was totally unexpected, threw everything into the utmost confusion. It was immediately necessary that some one familiar with the business and in a position to give it undivided attention be at once retained. Harry L. Trotman, plaintiff below, by reason of his long association with his father, and of the assistance he had long been accustomed to give, was singularly well qualified for this work. The widow waived her rights to administration; he qualified on the estate May 19, 1923, and immediately took charge thereof. A condensed statement of his transaction is set out in the report of Special Master Frank L. Crocker. There was cash in bank $369,346.85. Interest had accrued thereon in the sum of $11,478.27. Receipts from the sale of farm products for the then current year aggregated $147,235.82, while miscellaneous receipts summed up $65,260.44, making a total of $493,321.38. The intestate also owned six hundred and seventeen shares of stock valued at $73,965.00; and registered Liberty Bonds to the value of $52,500.00, therefore the personal estate amounted to $619,786.38. The real estate apart from that in controversy was valued at $210,450.00, probably a moderate estimate. It is difficult to state in detail the work which this administrator was called upon to do. The store had to be closed out and accounts collected; chattels from the various farms had to be sold; controversies with the taxing power, both State and Federal, had to be adjusted; rebates were collected from commission merchants; boats sold; life insurance policies collected. There was paid out by this administrator other than by way of distribution and commissions to himself $181,398.70. There was paid for fertilizer $46,050.65, for seed $22,327.72, for

mules $1,700.00, to creditors of the store $5,869.29, for farm labor $16,748.07. These items serve to indicate the multitudinous duties of this fiduciary, and the extent of his operations. He was highly successful, and there has been no criticism of his management of the many interests confided to his charge.

Mr. T. E. Trotman in his early life was a man of modest fortune, and his success in accumulating his estate was due in a large measure to his wife's assistance, and to that given to him by his two sons, H. L. and Percy E. Trotman. They had during their entire manhood given to him their whole services, and had received no stated compensation, but only such as the father had from time to time deemed expedient. A short time before his second marriage, and on September 1, 1923, he executed two deeds and delivered them to his son Harry. By them he conveyed the farm known as "Riverside," containing one hundred and thirty-six and a half acres, to Harry, and that farm known as "Earlhurst," containing one hundred and forty acres, to Percy, the consideration in each instance being "the sum of one hundred dollars and other valuable consideration cash in hand paid." These deeds at the date of their delivery were not stamped, and at the father's suggestion were not recorded promptly, and were not recorded at all until May 19, 1923, four days after his death.

In the meantime there was no change in the manner in which these farms were operated. They continued to be cultivated as had theretofore been the case by this father with the assistance of his sons, and the proceeds thereof were taken over by the father as had been his custom.

When the administrator qualified, or was about to qualify, some question arose as to the character of the

property represented by the growing crops, and was settled by an agreement which was:

"It is agreed between counsel, representing all parties to this suit, that the receipts from crops growing on the property during the year 1923 shall be treated as personalty, and shall be accounted for by the administrator just as any other personal estate that may come into his hands.

"Counsel for the widow and infant child of Mr. T. E. Trotman admits that the administrator is entitled to compensation for his services—in the cultivation, harvesting and marketing of crops of the land of the said Thomas E. Trotman at the time of his death, said compensation to be determined by the commissioner by taking into consideration first the commission of five per cent allowed by law upon the receipts, and such additional compensation as he shall determine from the evidence to be fair for the service rendered."

The decree of June 23, 1924, under which the special master acted, makes no direct reference to the commissions, but only provides in general terms for a settlement of the administration accounts. He is directed to state:

"An account of the receipts and disbursements of said Harry L. Trotman, administrator of Thomas E. Trotman, deceased, and an account of the receipts and disbursements of said administrator in relation to the cultivation, harvesting and marketing of the crops on the land of said Thomas E. Trotman at the time of his death."

The issue presented to the Commissioner is stated by him to be:

"Counsel for Mrs. T. E. Trotman, the widow, and the infant defendant, Helen Gardner Trotman, contend that she waived her right to qualify on the estate in

favor of H. L. Trotman, one of the decedent's sons, upon his assurance or promise to her that no commissions would be charged and therefore no commission should be allowed the administrator. The testimony on this point is to be found in the transcript of the evidence returned herewith, as follows."

These exceptions were filed to the report of the special master:

"Lucy Gardner Trotman and Helen Gardner Trotman, an infant under the age of twenty-one years, by Thomas H. Willcox, her guardian *ad litem,* except to the report of Frank L. Crocker, commissioner in chancery, filed herein on the 7th day of December, 1925, upon the following grounds:

"1. Because the commissioner allows Harry L. Trotman, as administrator of Thomas E. Trotman, commissions on that portion of the personal estate other than the amount received by said administrator from the sale of the farm products belonging to the late Thomas E. Trotman.

"2. Because the commissioner holds that the deed from Thomas E. Trotman to Harry L. Trotman, conveying a certain farm in the county of Norfolk known as Riverside, was a gift and not an advancement.

"3. Because the commissioner holds that the deed from Thomas E. Trotman, conveying a certain farm in Norfolk county known as Earlhurst, was a gift and not an advancement.

"WILLCOX, COOKE & WILLCOX,
                              Counsel."

The assignment of error in the petition for appeal which deals with commissions is as follows:

"The court erred in allowing and deciding that H. L. Trotman was entitled to the sum of $30,989.32 for his services as administrator of the estate of Thomas E.

Trotman, deceased.   The exception should have been sustained."

[1]  The master found that there was no agreement to waive commissions.   As to this there was some conflict of evidence, but he heard the testimony, and his findings, which met with the approval of the learned chancellor in the court below, we have no disposition to disturb.

It is to be remembered that not until this cause reached this court was there any objection as to the *quantum* of the allowance, but it was urged with earnestness that the contract to charge nothing whatever except upon farm products had been established. It was conceded that the administrator should be paid for his services in cultivating, harvesting and selling them.

The untimely end of that distinguished counsel, Judge Willcox, and the substitution of another with different views, probably accounts for this shifting position.   Judge Willcox was of opinion that because of a contract this administrator was, save within the limits noted, entitled to no commissions at all.   His successor believes that the sum allowed is, in any aspect, excessive, and that the trial court in its confirmation of this finding of the commissioner committed error patent upon the face of the record.   That counsel, equally sincere and able, should at times differ is of course inevitable.   Had the issue now raised been presented below there would in all probability have been additional evidence to meet it, and certainly the opportunity to produce such evidence should in good conscience have been given.

In *Watson* v. *Bruner*, 128 Va. 600, 105 S. E. 97, Judge Saunders, quoting with approval from *Hall* v. *Hall*, 104 Va. page 776, 52 S. E. 558, said:

[2, 3]  "But the report, except as to errors apparent

on its face, is *prima facie* correct, and where the evidence is conflicting, the appellate court will not reverse the action of the trial court, overruling the exceptions to the report and confirming it, unless the findings of the commissioner are clearly erroneous. The exceptions to the report partake of the nature of special demurrers, and serve to direct the attention of the court with reasonable certainty to a specific point in controversy."

In *Ober & Sons Co.* v. *Wm. G. Smith,* 122 Va. 311, 94 S. E. 787, the court said in the discussion of this matter:

[4] "Under the well settled rule on the subject, the evidence in the cause cannot be looked to by us to ascertain whether the conclusion aforesaid of the Commissioner was sustained or not sustained by the evidence. On the face of the reports aforesaid no error is apparent in such conclusion. No exception having been taken by appellant in the court below, as aforesaid, it is too late for it to raise the objection in this court on appeal. *Morrison* v. *Householder,* 79 Va. 627; *Hansucker* v. *Walker,* 76 Va. 753; *White's Ex'or* v. *Johnson,* 2 Munf. (16 Va.) 285. The conclusion of the commissioner and the adjudication of the court, by the decree complained of based thereon, aforesaid, were, therefore, final and conclusive upon appellant and are not open to review in this court. Hence we cannot sustain the assignment of error of appellant."

The only statute governing commissions to personal representative is found in section 5425 of the Code, where it is said that they shall be "reasonable," which is but another way of saying that they are to be measured by the conscience of the court.

[5] The value of the estate, the character of the work, the difficulties encountered, and the results obtained must all be remembered in reaching a judg-

ment.   The report of the commissioner must stand unless it is erroneous on its face.   Compensation to fiduciaries is a veritable well spring of litigation.

Judge Kelly, in *Williams* v. *Bond,* 120 Va. 678, 91 S. E. 627, said:

"Where no compensation at all is named in the will, the rule is that the allowance shall be reasonable, being usually five per cent on receipts, subject to increase or reduction of this rate under peculiar circumstances. These propositions are not controverted and are well settled."

In *Bliss* v. *Spencer,* 125 Va. 60, 99 S. E. 593, 5 A. L. R. 619, it was held that an administrator should not receive commissions on stock that it was not necessary to convert but which might be and should have been distributed in kind.

In *Allen's Ex'or* v. *Virginia Trust Co.,* 116 Va. 319, 82 S. E. 104, Judge Keith says that commissions should be charged against the assessed value of stocks and bonds delivered in kind.

In *Jones* v. *Virginia Trust Company,* 142 Va. 229, 128 S. E. 533, these cases are reviewed, and the court reached this very satisfactory conclusion:

"In reviewing the cases which hold that a fiduciary is not entitled to any compensation whatever where the property bequeathed (though not specific) is delivered in kind, we think the rule laid down is too restricted to meet the requirements of modern business. On the other hand, in view of the fact that the bulk of many large estates is composed of stocks and bonds, which are preferable to money, we are of opinion that the rule laid down in *Allen's Ex'or* v. *Virginia Trust Company, supra,* is too liberal."

It then proceeds to lay down general principles which should govern in the consideration of such an issue:

"Then, too, in many cases where the estate is large and easy of settlement, a commission of five per cent is out of proportion to the actual work required or performed.

"Inasmuch as the statute fails to lay down a hard and fast rule, we are of the opinion that the court should not do so. To us a fair construction of the statute seems to be that if the fiduciary sells property, of whatever kind, he is generally entitled to a commission of five per cent on the receipts. If he has the right to sell, but those entitled to the proceeds of sale prefer to take the property in kind, then he is generally entitled to receive five per cent commission upon the appraised value of the property. If he is not entitled to sell the property, but must deliver in kind (except in case of a specific legacy), he is only entitled to a reasonable compensation to be fixed by the commissioner, or court, upon the proper proof of the expense incurred, the risk taken, and the services rendered in connection with the property so delivered to those entitled thereto."

[6] Where the duties of an administrator are small and consist in the main in the simple distribution of assets, a commission of five per cent on cash, and on stocks and bonds distributed in kind, would be "unreasonable" when the estate is large, certainly in a case in which these items are in excess of $400,000.00, although even then compensation should be made for the responsibilities assumed. But this, in fairness be it said, is not the situation here. The character of the work has already been stated. Disputed claims in wide variety had to be adjusted; farm operations far in excess of what any ordinary administrator could have been called upon to perform were carried out. Stipulations of counsel show that extra payment for

this work was a contingency to be reckoned with. Registered government bonds were converted to those that passed by delivery. The store had to be closed out and the accounts collected. These and many other matters were presented to the commissioner, and to his finding on the issue here there was no exception. Our judgment on this branch of this cause is that there is no error on the face of the record, and that this exception must be overruled.

The next assignment of error rests upon the refusal of the court to treat as advancements the conveyance of "Riverside" to Harry L. Trotman, and of "Earlhurst" to Percy E. Trotman.

The suggestion that these conveyances were for value has been met by the declaration of the grantor himself. No recognition of any pecuniary obligation is shown, but it does appear that parental love and the memory of a wife long dead were the moving causes. Commissioner Crocker thus sums up the situation:

"The evidence does not leave us to conjecture as to his purpose and intent in making these deeds. He talked about the matter to his son, H. L. Trotman; to his son's wife, Mrs. Jennie H. Trotman; to his friend and trusted business associate, E. W. Jenkins, and to his sister, Mrs. Annie R. Sawyer. His purpose and intent was that he wanted to give to his two sons in addition to whatever share they might have in his estate after his death the farms conveyed by said deeds in recognition of, and compensation for, the life, long services they had rendered him, as well as in remembrance of their mother, the loving companion of his life from his young manhood up to and past the meridian of life, and who by her work with her needle, as well as her frugality, economy and encouragement, helped him to acquire his large estate."

[7] It is a settled law of this State that a free gift from a father to a son is presumed to be an advancement, but this presumption is not conclusive, and is always governed by the intention of the donor. The underlying idea is that he should, and usually does intend to, treat his children alike, that equality is equity, but that after all he is the best judge of the claims they have upon him, and his wishes when ascertained should govern. He may give his property in absolute estate to a child or to a stranger. He has the unqualified power of disposition.

In *McDearman* v. *Hodnett, et al.*, 83 Va. 281, 2 S. E. 643, it is said:

"It is well settled that questions of advancement always depend upon intention. It was so held by this court in the recent case of *Watkins* v. *Young*, 31 Gratt. (72 Va.) 84, and to the same effect are numerous cases. In *Watkins* v. *Young* the question was whether a gift made by the intestate in his lifetime, to one of his daughters, was intended as an absolute gift or an advancement. And in determining this question, it was said by the court that 'the declaration of the decedent, made at the time and subsequent to the gift, may be given in evidence to show that the gift was not made as an advancement, but as an absolute gift, and vice versa.' "

In *Hill* v. *Stark*, 122 Va. 280, 94 S. E. 792, the court says:

"In its strict technical sense an advancement is a perfect and irrevocable gift, not required by law, made by a parent during his lifetime to his child, with the intention on the part of the donor that such gift shall represent a part or the whole of the portion of the donor's estate that the donee would be entitled to on the death of the donor intestate."

In *Osborne* v. *Richmond*, 131 Va. 261, 108 S. E. 560, Judge Kelly restates the law thus:

"The general propositions of law controlling the subject of advancements are well settled in this State, and have been reviewed by this court in several recent cases. Whether a gift to a child, supposing the gift to be adapted to advance the child in life, is or not to be deemed an advancement such as must be brought into hotchpot depends upon the intention of the parent; and a free gift so adapted is *prima facie* to be presumed to have been so designated."

See also *Payne* v. *Payne*, 128 Va. 33, 104 S. E. 712, and *Poff* v. *Poff*, 128 Va. 62, 104 S. E. 719. Many other Virginia cases might be cited, but these suffice.

And so in its last analysis under settled rules of law we come to a question of fact. Has the purpose of the donor been disclosed by the testimony?

[8] We begin with the finding of a master approved by his chancellor. He heard the evidence, and saw the witnesses, and so in such circumstances we content ourselves with the statement that the correctness of his conclusions is strongly to be presumed.

[9] How is the intention of the intestate to be ascertained? We look first to the circumstances of the gift, *Payne* v. *Payne*, *supra*, and next to the declaration of the decedent, *McDearman* v. *Hodnett, et al.*, *supra*.

Conditions have already been described. Here was a man advanced in years, and with grown sons, possessed of a large estate to the accumulation of which they had contributed in a considerable measure and without stated compensation. In short, they had worked for him all their lives. He was about to contract a second marriage. It is reasonable to assume that while yet free to act he desired to make some compensation for all that they had done, nor did it

seem equitable to permit children who might there-
after be born to share equally in an estate which they
had no part in accumulating.    We are not, however,
left to inferences or required to balance presumptions.

E. W. Jenkins, his friend and trusted business asso-
ciate, testified as follows:

"Q. One. moment.    I only want you to state a con-
versation which relates to Mr. Trotman's intention
in the making of those two conveyances.    Any other
conversation between Mr. Trotman and yourself will
be irrelevant?

"A. Mr. Trotman told me he had made a transfer
of what he spoke of as Earlhurst, where Percy Trotman
lives, and Riverside, where Mr. Harry Trotman lives;
he had given Earlhurst to Percy and had given River-
side to Harry, and asked me if there was anything
wrong in it, and the conversation went on from that.
The purport of the conversation was this 'Was there
anything wrong in it.'    I said 'It is yours?'    'Yes.'
'Well, can't you do with it what you want to?'    'Yes.'
I said 'You can't do it after you are married,' and he
said, 'That is the question, but I want to show those
boys that they are very dear to me; their mother
worked with her needle to help make this property,
and she would sooner see those boys taken care of, if
she thought I was going first, than to be taken care of
herself.'    Well, we talked on, but I cannot remember
what we said, back and forth, but the final end of it
was 'Come what may, there will be enough left to
divide.' "

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Did Mr. Trotman, in his conversation with you,
on this particular occasion, state what his intention
was in making those two conveyances?    If so, state
what he told you?

"A. I practically covered that. . He said that he wanted, if I remember, to reimburse the boys. . Maybe that is not the word, but my recollection is that he said he wanted to show them that he loved them, wanted to give them this in appreciation of what they had been to him, and he was somewhat conscious there would be criticism, maybe, from somebody else, and we talked the matter over in that way."

Mrs. Jennie H. Trotman's evidence is to the same general effect. Harry L. Trotman's evidence in part is:

"Q. About what time was this conversation, was it just before his second marriage?

"A. Yes, sir, it was. The last conversation I had with him was a very short while before, probably two or three days. He said he was going to be married very soon. He said: 'I want to give you two boys a deed for your home while it takes only my signature to do so.' 'I want you to think of it as coming from your mother, in recognition of what she did for me in helping me to accumulate what I have, for what you and your wife'— he said: 'Have done for me.' He went on to speak of the time he was sick in 1916, and my wife rendered him very valuable service, to the extent, as he said, of 'saving his life,' by her actions, but that has no particular bearing on this, that I know of. He wound up his remarks by saying: 'You will always have this, regardless of what eventualities may occur,' and he said, 'The Lord knows I have got land enough to divide without taking this into further consideration.' "

Mrs. Annie R. Sawyer testified as follows:

"A. Well, he told me just before he was married that he was going to be married; that he had given Harry and Percy those places, and that he wanted them to have that extra; in case of any event it was theirs, they belonged to them. Then after he was

married, and after I came to Virginia to live, he came
to where I am living now one day and talked to me.
He spoke of it again, and said the same thing, that he
had done this, and that he was glad he had, that he
felt like he wanted to give them something extra,
that their mother helped him do it when he was making
his money. She helped him to make it, and he wanted
them to have it; he had enough to make all comfort-
able besides that, and that is as near as I can remember,
and about all he said about it to me."

This is the statement of the widow of her under-
standing of the transaction:

"I said to Mr. Trotman that I inferred from Mrs.
Trotman's letter that he had given them 'Riverside,'
and if he had I had rather not go there to live. His
reply was: 'I have not given it to them.' My reply was:
'You certainly must have led them to believe you
would.' He said: 'Yes, I have told them I was going to
give them 'Riverside,' and I expect to give Percy
'Earlhurst,' and I said: 'Why don't you do it now,'
and his reply was: 'I am not ready to do it at this time.'
Mr. Trotman spoke to me on a number of occasions of
the fact that he expected to give H. L. Trotman
'Riverside,' and one of the other farms there—said he
would not give him the entire place but would operate
the others for himself. He always said, 'I am going to
give Percy 'Earlhurst,' which met with my hearty
approval. You can well understand that I never
dreamed Mr. Trotman would give them those farms
without giving Helen something in place of it. He said
always, 'I will give Helen something in stocks and
bonds that will make her independent.' "

From this evidence as a whole the intention seems to
be clear. He said to one witness:

"You will always have this regardless of what

eventualities may occur.   The Lord knows I have got
enough land to divide without taking this into further
consideration."

To another he said:

"Come what may, there will be enough left to
divide," and he told another:

"That he wanted them to have that extra, in case
of any event it was theirs.   They belonged to them   *
*   *   *   that he felt like he wanted to give them
something extra."

[10] We are of opinion that this evidence amply
sustained the finding of the commissioner, and that
this assignment of error is not well taken.

During the argument of this case *Rowe* v. *Rowe*, 144
Va. 816, 130 S. E. 771, was frequently adverted to
with praise and blame.   That case was properly
decided.   Mr. Rose consulted counsel as to the status
of his gifts.   The doctrine of advancement was properly
explained to him.   In reply he said, "Is that so," and
after reflection summed up the situation thus: "Well,
I don't know but that the law makes as good a will as
I could make," and so this court was of opinion that
the presumpton of advancement was sustained rather
than overcome by the declarations of the donor.

[11] The court, however, in discussing the effect of
the evidence, did say that the circumstances and rela-
tions between the father and the children did not
have any bearing *in that case*.   Such circumstances and
relations were properly admitted as evidence upon the
general question of intention.   In a prior part of the
opinion the court ruled, after stating the presumption
as to advancements, that "this presumption may be
rebutted by affirmative proof, and for the purpose of
showing the real intention of the ancestor, his declara-
tions or statements made at the time of the gift or

subsequently are competent evidence, as well as the circumstances of the ancestor and relations existing between him and the child," but held in that case that any inferences from them had no sufficient bearing or weight in it to overcome the positive proof of the actual intention of the decedent to make the gifts to the children as advancements.

[12] Opinions of courts, to be correctly understood, should always be read in the light of the facts of the case in which they are rendered. *City Gas Co.* v. *Poudre*, 113 Va. 224, 74 S. E. 158, and *Atlantic Coast Realty Co.* v. *Townsend*, 124 Va. 506, 98 S. E. 684.

We are of opinion that the decree appealed from should be affirmed.

*Affirmed.*