# Richmond

## A. E. HARRIS, SELDEN S. HARRIS, ET AL. V. CITIZENS BANK & TRUST COMPANY.

January 9, 1939.

Record No. 1992.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

114

The opinion states the case.

*George E. Allen,* for the appellants.

*W. Moncure Gravatt* and *J. Segar Gravatt,* for the appellee.

HOLT, J., delivered the opinion of the court.

Captain J. M. Harris, a prominent citizen of Nottoway county, who died testate on May 4, 1930, appointed the Citizens Bank & Trust Company of Blackstone his executor and asked that no security be required on its executorial bond. He gave to his son, A. Epes Harris, all that might be due on that son's notes evidencing a balance on account of the purchase by the son from the father of his residence in Blackstone. He gave to Hattie Tingley Harris, wife of James Madison Harris, Jr., in trust for his benefit, a one-sixth residuary interest, "subject to any liability of the said J. M. Harris, Jr., to my estate by reason of any endorsement or guarantee I may have made for the benefit of the said J. M. Harris, Jr., since October 1, 1928." In the event that Hattie Tingley Harris should decline or resign this trust, the Citizens Bank & Trust Company is appointed trustee in her place and stead. The remaining five-sixths of this estate is given to the following children, namely: William J. Harris, R. Logan Harris, A. Epes Harris, Selden S. Harris, and Lunetta Harris Gillespie, share and share alike. He released all of his six children from liability on account of advancements, etc., "except and unless such loan or loans, advancement or advancements and endorsement or endorsements are evidenced or represented by notes and bonds." Compensation to this executor is fixed at 2½ per cent, not to exceed $1,000. There are pecuniary bequests to others, relatively not large. This will was probated, and the executor qualified. Appraisers were appointed, who made this return:

| | | |
|---|---|---|
| "Cash in Citizens Bank & Trs. Co. | $ | 894.80 |
| "3 shares U. S. Asphalt Co. Class A | | 0 |
| "5 shares Blackstone Courier Corp. par value, $100.00 | | 250.00 |
| "5 shares Klotz Silk Mfg. Co. par value, $100.00 | | 375.00 |
| "10 shares Woodlawn Dev. Co., par value $100.00 | | 1,000.00 |
| "$30.00 2nd M. Bond U. S. Asphalt Corp. | | 0 |

"Note Geo. Stokes, dated 10-5-18 for $500.00 subject to
        credits of $236.50, present value        $250.00
"25 shares of the Aud. Co. par value $1.00        0
"15 shares Blackstone Land & Imp. Co. par value $100.00    150.00
"$5,000.00 note of Wm. J. Harris, dated Apr. 2, 1930    5,000.00
"$20.00 note of Sara Barco, dated 12-24-29    0
"$21.00 note of C. C. Cardozo, dated 3-26-29    0
"$250.00 note of R. S. Cushwa, dated 10-9-28    0
"$4,000.00 note of A. E. Harris, dated 1-9-26    4,000.00
"$4,000.00 note of A. E. Harris, dated 1-9-26    4,000.00
"$4,000.00 note of A. E. Harris, dated 1-9-26    4,000.00
"$4,000.00 note of A. E. Harris, dated 1-9-26    4,000.00
"$50.00 note of Sarah Pollard, dated 9-10-27    0
"$270.00 note of J. P. Fitzgerald, dated 3-27-29    270.00
"$40.00 note of C. C. Cardozo, dated Feb. 5, 1930    0
"$20.00 note of J. M. Harris, Jr., dated 2-11-30    20.00
"$10.00 note of J. M. Harris, Jr., dated 2-24-30    10.00
"200 shares stock Citizens Bank & Trust Co.,
        par value $25.00    9,000.00
"9 shares of stock of Bank of Crewe, par value    450.00

### "EQUITABLE OR MARGINAL INTEREST IN BELOW NAMED STOCKS:

"100 shares Va. Car. Chem. Co. pfd stock, par
        value $100.00, appraised value    $ 8,000.00
"45 shares of Abitibi Power & Paper Co. par
        value $100.00, appraised value    3,375.00
"50 shares Gen Gas Elec. Co. 6% pfd stock Common A, appraised value    4,500.00
"100 shares Wesson Oil pfd no par value, appraised value    5,400.00
"50 shares Gen. Amer. Inv. par value $100. appraised value    4,750.00
"50 shares Standard Oil of N. J. par value $25.00, appraised value    2,900.00
"50 shares Anacondo Copper Min. Co. par value $25.00, appraised value    3,750.00
"50 shares Mengal Box pfd, par value $100.00, appraised value    4,450.00
"100 shares of Lorillard, par value none, appraised value    2,400.00
"20 shares Amer. Can Common, no par value, appraised value    2,800.00
"1-2/40 shares Amer. Cities Power & Light B par value none, appraised value    20.00
"100 shares Internat. Shoe Co., no par value, appraised value    5,900.00
"500 shares Freeport Texas Co. no par value, appraised value    20,500.00

"100 shares Amer. Cities Power & Light A no
        par value, appraised value       $ 4,125.00

                                    72,870.00
"Less debit balance due Scott & Stringfellow
        of Richmond, Va., on above stocks   20,217.51   $552,652.49

"Real Estate:
"Lots 37 & 38, Section 26, Blackstone, Va.               20.00

                                     86,342.29

Of course the testator's indebtedness had to be met; it amounted to about $45,000.

No *ex parte* settlement was made, and at the first April rules, 1935, of the Circuit Court of Nottoway county, A. E. Harris, Selden S. Harris, William J. Harris, Hattie Tingley Harris, James Madison Harris, Lunette H. Gillespie and Julia H. Harris filed their bill in equity against it, in which they prayed for an accounting and charged that the estate had suffered heavy losses through nonfeasance and neglect. The defendant answered and said that it had been in no wise negligent and that no loss had been suffered because of its failure to discharge its duties. In addition, in a plea filed, it contended that all of the other heirs of the estate of J. M. Harris had conveyed to A. E. Harris their interest therein, and that A. E. Harris and the executor had settled their differences in a binding contract.

At the second April rules of said court, this executor filed its bill in equity, to which A. E. Harris and Louise O. Harris, his wife, were made parties defendant. In it the same settlement relied upon in its plea is set up. It asked that this contract settlement be specifically enforced and performed. By decree of January 17, 1936, these two causes were by consent consolidated and in that decree the second cause was dismissed. Afterwards a bill of review was filed to it by the bank; to it a demurrer was interposed and sustained by a decree of October 7, 1937. There was a reference to a commissioner, a report, exceptions and final decree.

The distinguished chancellor presiding, now dead, being "of the opinion that the Citizens Bank & Trust Company, executor under the will of Capt. J. M. Harris, deceased, has performed its duties as executor as a reasonably prudent person and is not liable to the complainants upon the alleged charges of negligent conduct, * * * " did so decree.

There are a number of assignments of error; the first is:

"It is respectfully submitted that the court erred in its decree of the 21st day of January, 1936, in holding that the executor had performed its duties and was not liable upon the charges of negligent conduct in the handling of the assets of the estate. This assignment of error involves:

"(1) The conduct of the executor in allowing approximately $70,000.00 worth of stocks listed on the New York Stock Exchange to remain in a margin account with a broker from the 4th day of May, 1930, the date of the death of the decedent, until the 21st day of March, 1932, during which period the account practically closed itself out.

"(2) The conduct of the executor in holding 200 shares of its own capital stock belonging to the estate from May 4, 1930, until April, 1936, without making any effort whatsoever to sell it.

"(3) The conduct of the executor in holding 10 shares of the capital stock of the Woodlawn Development Company belonging to the estate from *April* (should be May) 4, 1930, until February 5, 1937, without making any effort to sell it.

"(4) The conduct of the executor in failing to file with the Commissioner of Accounts, as required by law, any account whatsoever of its transactions for a period of approximately five years."

Captain Harris, at the date of his death, was the owner of stock in sundry corporations which was then deposited with his brokers, Scott & Stringfellow of Richmond, Virginia, on a marginal account. Its market value, as of May 5, 1930, in round numbers was $69,000, but there was a debit balance due to his brokers of $20,200, from which it appears that he had an equity of $49,400; but from that must be deducted his son's (A. E. Harris') liability to these

brokers, guaranteed by the father. There was due from this son to these brokers $25,500. Stock deposited by him to secure this had a market value of $19,900; his account was therefore short $5,600, and for that sum the father was liable on his guaranty. If this be taken from the father's equity, this marginal account then had a value of $43,800.

At first, the relations between the bank and the Harris heirs were exceedingly friendly. Captain Harris had been its president for the past ten years and was a borrower. On May 7, 1930, its executive committee met with R. L. Harris, A. E. Harris, S. S. Harris and J. M. Harris, Jr. It was of opinion that this stock should be sold at once and the estate settled promptly. To this the Harrises would not agree; they were of opinion that a sale in the then depressed condition of the stock market would entail unnecessary losses upon them, who alone were interested, although they were willing that enough stock be sold to pay Captain Harris' indebtedness to Scott & Stringfellow.

To relieve the bank, they executed and delivered to it this writing:

"Blackstone, Virginia,
"May 7, 1930.

"Citizens Bank and Trust Company,
"Executor of J. M. Harris, deceased,
"Blackstone, Virginia.

"Gentlemen:
"Feeling that you would wish to consult and advise with the devisees and legatees of J. M. Harris, deceased, whose executor you are, in the handling of his estate, and realizing that it will be very inconvenient, if not impossible to get all of the devisees and legatees present, when needed, we, constituting all of the legatees and devisees of J. M. Harris, have therefore appointed and do hereby appoint and constitute R. Logan Harris and A. Epes Harris, to represent us, the undersigned devisees and legatees of J. M. Harris, deceased, in consulting and advising with you about the han-

dling of his said estate, and we do hereby obligate ourselves to be bound by any advice or recommendation made to you by said R. Logan Harris and A. Epes Harris in and about the handling of said estate, including the sale or disposition of any stocks, bonds, or other property of said estate.

"Yours very truly,

"WILLIAM J. HARRIS,
"S. S. HARRIS,
"A. EPES HARRIS,
"R. L. HARRIS,
"LUNETTA H. GILLESPIE,
"J. M. HARRIS, JR.,
"MRS. J. M. HARRIS, JR.,

"Devisees and legatees of
J. M. HARRIS, deceased."

Enough of this stock was then sold to pay the balance due these brokers; that unsold remained with them and, as we shall see, was used to secure another loan from them afterwards made. Just why the A. E. Harris debt was not then paid, we do not know. Probably it was thought that prosperity around the corner would so add to the value of his stock as to wipe away the father's guaranty.

R. L. Harris and A. E. Harris were both men of wide business experience, acquainted with dealings on the stock exchange and the customs which there prevailed. R. L. Harris had been a State bank examiner and was himself then an executive officer in a national bank; no doubt for this reason these gentlemen were selected to represent the heirs.

All parties to this litigation were then upon terms of the utmost friendliness. Conferences and communications were constant, and all that was done was done with the knowledge and consent of everybody. Scott & Stringfellow had been paid, but there was still more than $20,000 of debts outstanding and bearing interest. Something had to be done,

and so on March 17, 1931, these executors borrowed from those brokers $19,500 and with this money made these payments: To the bank, $1,577.25; to William H. Cralle, $7,767.50; to the Beverage Products Company, $2,353.87; to the Bank of Crewe, $4,000, and to the American National Bank, $3,000, together with certain minor expenses.

That loan come about in this wise: Creditors had become insistent. On January 13, 1931, Booker wrote to R. L. Harris and said:

"'It occurred to me that in case Walter Robertson of Scott and Stringfellow would accommodate Capt.'s estate, that a loan could be arranged with which to pay off such indebtedness rather than sell any of his securities at the low market."

On January 19, 1931, Harris wrote to Booker: "It would be a shame to sell in this low market." Dealing with the suggested loan, he also said: "I think it would be the best thing to do." On February 25th, following, Booker wrote to Harris: "It appears to us highly advisable that all the stock listed on the Stock Exchange be sold and the account liquidated," and asked him to come to Blackstone for a conference. The loan, as we have seen, was consummated on March 17th. As late as April 30th, Harris wrote to him, saying: "Don't let Scott & Stringfellow close the stock out."

On May 21st, Harris wrote this to Scott & Stringfellow: "If all the stock had been sold at once we might have saved something, but we did not dream of this slump. Booker wanted to sell all of the stock when they borrowed the last money, but I did not; thought things would come back and would not go low enough to endanger the margin and you agreed with me."

Plainly the Harris legatees, or their representatives, hoping against hope, were unwilling to close out the Scott & Stringfellow account, but to the disappointment of all, values did not appreciate but drifted lower. Margins faded, more collateral was demanded but was not forthcoming, and so the account closed itself. As of May 5, 1931, the estate's equity had a value of something like $8,000, and when it was actually closed, its value was $2,457.35.

Since sale was postponed at the instance of these legatees, or their representatives, and against the express wishes of the executor, they alone must bear the burden of this disastrous result.

The standard by which the conduct of trustees, executors and other fiduciaries is to be measured has been many times stated and restated, both in this State and elsewhere. They are required to do those things which a man of reasonable intelligence and prudence would be expected to do in the management of his own affairs, but this rule, like most rules, is to be construed in the light of the conditions obtaining when it is applied. More would be expected of the Guaranty Trust Company of New York than of a county bank at Churchville, which is but to say that negligence itself is an elastic term.

This rule, for all practical purposes, has been universally adopted:

" * * * it is well settled that the measure of care and diligence which an executor or administrator is bound to bring to the management and closing of the estate, is that which an ordinarily prudent man would exercise under like circumstances in his own affairs." 11 R. C. L. 133; 24 C. J. 48.

Moreover, if that done be prudent or not, if done at the instance of those who are to profit or lose, liability does not attach.

"Where an executor or administrator has acted in good faith, and his course of conduct has been requested, authorized, or assented to by the heirs or distributees, with knowledge of all the material facts, this may excuse him from any liability to them for resulting losses, even though he has deviated from the line of his duties." 24 C. J. 127; 11 R. C. L. 142; note, 40 L. R. A. (N. S.) 234; *In re Fulton Trust Co.*, 257 N. Y. 132, 177 N. E. 397, 77 A. L. R. 505; *Hoyt* v. *Sprague*, 103 U. S. 613, 26 L. Ed. 585.

In the *Fulton Trust Company Case*, a distinction is pointed out between the purchase of new stock and the retention of that which came into the hands of the trustee.

One who has something thrust upon him must do the best he can, but he must not, of his own motion, speculate at the expense of his trust. This subject is dealt with in *Re Pettigrew's Estate,* 115 N. J. Eq. 401, 171 A. 152, 155, where it was said:

"For the precipitous decline in the market and the general economic depression which followed, the executors cannot be held to account. To have sold the securities under such conditions—and at a time when even financial geniuses were literally pouring their fortunes into the stock-market coffers so that they might be able to hold rather than sacrifice their securities—would probably have rendered the executors surchargeable for what then, to most all, hopefully appeared to be but temporary and retrievable abnormal shrinking in values."

Two cases have been stressed by the petitioners as supporting their conclusions. One is *In re Busby's Estate,* 288 Ill. App. 500, 6 N. E. (2d) 451. There the First National Bank of Chicago was held liable on this state of facts: Leonard A. Busby died, leaving to survive him his widow and two minor children. His estate was large and consisted in part of valuable stocks held on marginal accounts. The court said that they were speculative, and that it was the executor's duty to sell at once, and that it was liable for losses occasioned by its failure to do so. In that case it appears that the widow was not consulted or advised as to the condition of the estate until September 25, 1930.

Sales were not deferred at Mrs. Busby's request. So far from that being the case, she promptly in writing requested the bank to sell. The court in that case recognized that it was proper to consult the widow, and, in the course of its opinion, observed [page 464]:

"When she was asked to approve the 'immediate sale at the market' of securities then having a market value of over $800,000, she did not hesitate to do so. After her approval was had on September 25, 1930, the last obstacle to the prompt and orderly liquidation of a major portion of the securities was removed and the executor was chargeable with

the duty of conserving the estate by reducing its perishable assets to cash."

The other case is *Matthews* v. *Sheehan*, 76 Conn. 654, 57 A. 694, 100 Am. St. Rep. 1017. Here also were stock brokers' accounts. The court said that [page 696] "the 'administrators, in the exercise of their best judgment, and with the approbation of the widow and the three heirs living in Connecticut, decided that it was not for the interest of the estate to place all of said stocks on the market at that time and force their sale, but thought it best to hold them for better prices, or for a distribution to the widow and heirs, as hereinbefore stated.' It is further found that in this matter the administrators acted in good faith, in the exercise of their best judgment, upon the best advice and counsel obtainable."

One of the issues presented was: Did Mrs. Matthews consent to the course of action pursued by the administrators? The court said:

"The committee has not found specifically that Mrs. Matthews did or did not consent to the course pursued by the administrators with the speculative accounts; but we think the fair import of the report upon this point is that, up to the 1st of February, 1893, she did consent, as the others did, to the acts of the administrators with reference to the speculative accounts, and that the finding must be so construed. It follows from this that for losses to the appellant, if any, resulting from continuing the speculative accounts up to the end of January, 1893, the administrators are not acountable to her, but that for losses so resulting after that time they are accountable."

Plainly these cases do not hold that an executor, as a matter of law, is liable for failure to sell where that failure is due to a request by those who are alone interested; certainly it is not liable to them for losses which follow.

The decisions in Virginia are in line with these rules elsewhere generally prevailing. Prof. Minor in 2 Minor's Inst. (4th Ed.), p. 255, said:

"But nothing more is in general required than that he should act in good faith, and with the same prudence and discretion that a prudent man exercises in his own affairs. If more than this were exacted, it would tend to the disadvantage of persons interested in trusts in general, because it would discourage competent persons from accepting the administration of trusts," quoted with approval in *Shepherd* v. *Darling,* 120 Va. 586, 91 S. E. 737, 739.

In *Clemons* v. *Dennis,* 165 Va. 18, 181 S. E. 387, 388, Mr. Chief Justice Campbell restates the rule:

" * * * courts of equity look with indulgence on the acts of fiduciaries, and if it is manifest that they have acted in good faith in the exercise of a fair discretion, and in the same manner in which a prudent man would act in regard to his own property, they will not be held liable for any loss which may occur."

In varying phraseology, it has been approved by this court times without number.

If the executors followed the express wishes of these legatees, they can not complain. This principle goes to the very base of justice and rests upon elementary rules of estoppel.

In *Perry* v. *Smoot,* 23 Gratt. (64 Va.) 241, a testator directed that certain real estate be sold and from the proceeds of sale $10,000 was to be invested in the bonds of the Commonwealth, for the benefit of his daughter, Suzannah. This was not done, but the executors paid to her annually sums which would have amounted to interest on her legacy. Since all of this was done with her knowledge, it was held that she could not complain.

To the same effect is *Watkins* v. *Stewart,* 78 Va. 111. There an administrator, who had failed to collect bonds of the decedent, was held not liable, though the bonds themselves afterwards proved to be worthless. The beneficiaries had requested that this investment, which they thought was a good one, remain undisturbed.

As we now see it, it would have been wise to close out this Scott & Stringfellow account at once, but for their fail-

ure to do this there is ample excuse. If every one who held stock in these corporations could have known just what was ahead of them, a vast majority of them would have undertaken to sell forthwith, and there would have been no market at all. Moreover, as we have seen, all that was done was done with the assent of those who now complain.

It is claimed that whatever may be the rights of others, Mrs. Hattie Tingley Harris, trustee for her husband, had the right to have this estate settled promptly in that she did not sign the communication addressed to the bank on May 7, 1930. She testified that she did not sign it, that she did not know of its existence until several months after Captain Harris' death and did not know that her name was appended thereto until this suit was instituted.

The original with her signature attached is in evidence, as is her signature to other writings conceded to be genuine. Certainly to a nonexpert, they appear to be alike. The trial court thought that it was genuine, and its conclusions we follow unless they are shown to be wrong. It is inconceivable that this closely knit family would conspire to give away her rights in a matter so important. There was no occasion for concealment, and no motive for forgery. The administration of this estate was to these people a matter of prime importance, and we would have to be exceedingly credulous not to believe that it was discussed in all its phases almost daily. Mrs. Harris knew about the will; she knew that she was entitled to one-sixth of this considerable estate and that she had received nothing. She made no demands upon the executor. Knowledge of facts which puts one upon inquiry in themselves, in time, may merge into acquiescence.

Complainants claim that they have suffered loss because this executor did not promptly sell 200 shares of its own stock, an asset of the estate of the decedent. That estate did own these shares of this stock. They were appraised at $45 a share, or at $9,000. At that time they had a par value of $25. Neither the heirs nor their repre-

sentatives undertook to control the executor in its dealings therewith.

Values steadily fell away. On April 22, 1932, Booker wrote Mrs. V. R. Gillespie that it was worth about $7,000, and on May 27, 1932, he wrote her that it was worth about $5,000, but at the same time said: "There is absolutely no market for any of the assets held by Captain's estate and until these stocks can be sold of course there can be no distribution made."

In a statement of December 6, 1934, prepared for the Commissioner of Accounts, a copy of which was sent to the beneficiaries, it is listed as having a par value of $12.50, the capital stock of the bank having been in the meantime reduced. Indeed, they were advised from time to time as to prevailing conditions. Nothing was done until January 21, 1936, when the court ordered a sale at not less than $16 a share, which was accordingly had.

We have already had occasion to consider the duties of executors. As was said by Mr. Chief Justice Campbell in *Clemons* v. *Dennis, supra,* " * * * fiduciary, in handling private funds, he is not responsible for the loss resulting, where he has acted in good faith and in the exercise of a fair discretion, and in the same manner as he probably would have acted if the subject had been his own property and not held in trust."

There is nothing from which bad faith can be inferred, and if liability attaches, it must be because of bad judgment.

Blackstone and its banks, in the main, do business with and are dependent upon a nearby agricultural district whose principal product is tobacco. It was visited in 1930 by an extraordinary drought. This tobacco district was devastated the year following by a widespread storm and suffered still another drought the following year; and so for the time being, the pecuniary resources of this agricultural district were almost nonexistent.

The acute depression from which the country at large was at that time suffering is probably remembered by us all, and for reasons indicated, the distress in this tobacco-growing

section was even more acute. No form of business suffered more than banking. Banks lived dangerously, if they lived at all. Certainly this stock was not then a popular form of investment.

Four gentlemen of wide experience have testified. Mr. Booker said there was no market for this stock. Mr. W. S. Irby is president of a bank at Kenbridge and was at one time president of the State Bankers Association of Virginia. He said that conditions were so distressing that one-eighth of the neighborhood people were on relief and that in his community there was no market at all for this stock during this period.

F. W. Sheffield, cashier of the Bank of Crewe, makes the same statement. He also said that any forced sale would have been at a great sacrifice. S. L. Barrow has been president of the First National Bank at Blackstone for 12 or 15 years and said: "There has not been a time when the stock could have been sold at any reasonable figure since 1930."

As supporting the conclusions of these witnesses, it is interesting to note that Mr. Irby's bank has been the owner since 1930 of 206 shares of stock in the defendant bank. Up to now, he has been unable to find a purchaser who was willing to give anything like what it was worth. That is to say, Mr. Irby, a man of wide experience, stills holds this stock because he has been unable to sell it.

For the same reason, a claim of $207, resulting from the failure of the executor to sell more promptly a small block of stock in the Bank of Crewe, is rejected.

It is charged that stock in the Woodlawn Development Company was needlessly sacrificed in that it was sold for less than it would have brought but for unconscionable delay, the damages claimed being $1,275. This is a small corporation with stock closely held. Its assets consist of 350 lots and 47 acres of timberland about two miles from Hopewell, together with notes in unnamed amounts doubtless given for balance due on lots heretofore sold. It owes $2,500. No dividends have been paid for ten years and no

lots have been sold in recent years, nor has any stock been sold since 1930. It was suggested at a corporate meeting that Captain Harris' stock be bought in by the company but that suggestion was voted down, and the evidence is that no stock could have been sold publicly for a fair price since 1930 but that it is in fact worth now what it was worth then. The appraisers valued it at $100 a share. That held by the executors was sold on February 5, 1937, at public auction at $25 a share. Since it is worth now what it was worth at any time since 1930, no loss has been occasioned by delay. Mr. Adams, the commissioner in chancery, has reported that there was absolutely no market for this stock at all.

The executor did not make annual *ex parte* settlements of its accounts, as it is required to do under Code, section 5409. $1,000 compensation to the executor has been allowed by the court. Notwithstanding the statute, this is a matter within the sound judicial discretion of the chancellor. *Mapp* v. *Byrd*, 169 Va. 519, 194 S. E. 724; *Crigler's Committee* v. *Alexander's Ex'r*, 33 Gratt. (74 Va.) 674; *Lovett* v. *Thomas' Adm'r*, 81 Va. 245.

In *Cannon* v. *Searles*, 150 Va. 738, 143 S. E. 495, 499, Judge Christian said:

"The general rule on the subject of the fiduciary's compensation is that the amount thereof, or whether for maladministration he should be denied all compensation, is within the sound judicial discretion of the court to be exercised according to the circumstances of the particular case. In Virginia the practice is to allow five per centum commission upon receipts, unless reason to the contrary is shown. *Allen's Ex'x* v. *Virginia Trust Co.*, 116 Va. 319, 82 S. E. 104."

In the instant case, the delay in making a prompt and final settlement was due primarily to the conduct of the beneficiaries themselves. Moreover, they were kept adequately and constantly informed as to the condition of the estate.

Judge Cox did not abuse this discretion. His knowledge of local conditions is more accurate than ours could possibly

be, and where there is conflict of evidence, his conclusions are entitled to great weight. *Crump* v. *Bronson*, 168 Va. 527, 191 S. E. 663.

It is claimed that the court erred in not directing an issue out of chancery to try the charges of negligence against the executor. The chancellor may order such an issue. Code, section 6246. This, too, is a matter subject to his sound judicial discretion and is subject to review on appeal. *Hook* v. *Hook*, 126 Va. 249, 101 S. E. 223. To justify it, the conflict of evidence must be great and its weight so nearly evenly balanced that the court is unable or with difficulty able to determine where preponderance rests. It is not enough that the evidence be contradictory. If this were true, the time of chancery courts would be taken up in jury trials. *Stevens* v. *Duckett*, 107 Va. 17, 57 S. E. 601, 603; *Massie* v. *Parrish*, 140 Va. 717, 125 S. E. 691; 2 Daniel's Chancery Practice, 1072. In the instant case, the facts which are relied upon to establish negligence are not in dispute at all.

It is difficult to reconcile all of the decisions on this subject, but we think this is a safe rule to follow: The necessities for an issue must plainly appear before we can say that judicial discretion has been abused. The judgment of the trial court is entitled to the same weight which attaches to it in other cases. The chancellor is the keeper of his own conscience and the purpose of the issue is to satisfy him. Moreover, the verdict in such a case is not binding but is merely persuasive.

In addition to losses claimed to have been suffered through negligence, it is contended that the executor has paid debts which it should not have paid.

It has been credited with $2,050 paid on January 31, 1933, to take up a note of date March 20, 1930, executed by B. E. Cobb, Jr., and endorsed by J. M. Harris. This note was for the principal sum of $1,762.88. It was due 45 days after date. 45 days after date brought its maturity to May 4, 1930. That day fell on a Sunday, and so the next business day was May 5th. Through some mistake it was carried

on the bank's books as due on May 3rd and protest was not waived. Harris died on Sunday, May 4th. He was buried on May 6th, and his executor qualified on May 7th; therefore, it appears that this executor, who had been nominated by the testator, had not in fact qualified when this note matured. It did, however, on May 5th make thereon this endorsement:

> "Protest waived
> J. M. Harris
> by Citizens Bk & Tr Co
> J. A. Booker
> Cashier
> 5-3-30      Executor"

This endorsement, made on May 5th, was dated May 3rd because Mr. Booker at that time was of the impression that the note fell due on Saturday and not on Monday.

The Negotiable Instruments Law was codified by an act of the Legislature approved March 3, 1898. Acts of Assembly, 1897-98, ch. 866, p. 896. Section 98 of it reads:

"When any party is dead and his death is known to the party giving notice the notice must be given to a personal representative if there be one and if with reasonable diligence he can be found. If there be no personal representative notice may be sent to the last residence or last place of business of the deceased." Code, section 5660.

An executor derives his power from the will and at common law might at once do those things which pertain to his office and which are not forbidden by statute. *Monroe, Ex'r* v. *James,* 4 Munf. (18 Va.) 194. In Virginia he also derives his power from the will, yet that power is not consummated until statutory requisites are complied with, Lomax on Executors, Vol. 1, p. 367; although he may at once do whatever is necessary to protect the estate from waste, pay funeral expenses, etc. Code, section 5357.

Notice of dishonor may be by a paper writing or may be merely oral. All that is required is that the party

may have been given complete knowledge of the situation, and, as we have seen, in a case like this, notice addressed to the last place of business of the deceased is sufficient, there being then no personal representative, as is one sent "to the legal representative." *Boyd's Adm'r* v. *City Savings Bank,* 15 Gratt. (56 Va.) 501. Notice to an executor before he has qualified is sufficient. 8 C. J. 647, and cases cited. Here no notice at all was necessary. The will was with the bank, and it was the bank's intention to qualify as soon as it could do so in deference to conventions. It was the holder of the note and the named executor.

Captain Harris' place of business was at the bank, and so it would have been perfectly idle to have addressed notice to his personal representative in care of the bank. The bank, in its own right, and as executor, had full knowledge of every necessary fact. To have sent notice to his home, where he lay still unburied, would have been intolerable. There is no merit in this assignment.

It is said that decedent's estate is no longer liable on this note because of certain renewals:

"(a)    $2,330.00        Newport News, Va., March 6, 1930

"Sixty days after date I promise to pay to J. M. Harris or order Twenty three hundred thirty & no/100 Dollars, negotiable and payable at the SCHMELZ NATIONAL BANK, NEWPORT NEWS, VA. The makers and endorsers of this note hereby waive presentation, protest and notice of dishonor and the benefit of their homestead exemptions as to this obligation; and further agree to pay costs of collection, or an attorney's fee, in case payment shall not be made at maturity.

"(Signed)   R. L. HARRIS
"(Address) c/o Schmelz Natl. Bank
Newport News, Va.

"No. 52916   Due May 5"

To sustain this claim, our attention is invited to Code, section 5682, where it is said:

"A person secondarily liable on the instrument is discharged—

\*   \*   \*   \*   \*   \*   \*

"6. By any agreement binding upon the holder to extend the time of payment or to postpone the holder's right to enforce the instrument unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved."

It was endorsed by the payee, J. M. Harris, and was discounted by the Citizens Bank & Trust Company of Blackstone for the benefit of its maker, R. L. Harris.

J. M. Harris, as we have seen, died on May 4, or one day before it came due. R. L. Harris executed renewals from time to time. Final payment was made by decedent's executor on April 20, 1936, the amount then due with accumulated interest being $2,894.91. When some of these renewals were made interest was actually paid by the maker, R. L. Harris; sometimes it was not paid but was added into the renewal note. Upon none of them is there any endorsement by the executor or by any one else; that is to say, never on any of them was there anything to indicate that decedent's estate was still liable, although the executor was given power to execute renewals by Code, section 4149(71)a, provided they did not extend the period of payment beyond two years from the date of its qualification.

In such a case, the general rule is this:

"When the principal and surety are bound to the creditor by a note or other negotiable instrument, if the creditor take from the principal a new note or bill of exchange for the debt, falling due after the period when the original obligation matures, this generally amounts to an extension of time and discharges the surety." Brandt Suretyship Guaranty, Vol. 1 (3d Ed.) section 398.

In *Callaway's Ex'r* v. *Price's Adm'r,* 32 Gratt. (73 Va.) 1, it appears that Leftwich was a principal and Price a surety on a bond payable to Callaway. Price, the surety, died before it became due and Leftwich qualified as administrator. Callaway brought suit. Leftwich induced him to dis-

miss it and gave him his three negotiable notes, payable at three, six and nine months for its original amount. Callaway contended that he had been advised that such a transaction would not relieve Price's estate or serve to suspend a right of action on the bond itself. Judge Staples said:

"The question is not what they believe, but what was the legal effect of the arrangement, in the absence of an express agreement that the acceptance of the notes should not suspend a right of action on the bond.

\* \* \* \* \* \* \*

"I attach no sort of importance to the fact that Callaway did not surrender the bond.

\* \* \* \* \* \* \*

"But if I am mistaken in supposing there was an express agreement for further time, there can be no doubt the legal effect of accepting the notes was to suspend the right of action on the bond during the period allowed for the payment of the notes. Whilst the mere taking [of] a negotiable security, payable at a future day, does not, unless so agreed, operate as a payment of an antecedent debt, it does operate to suspend the right of action on the original demand until the maturity of the bill or note, unless it is made to appear it was received simply as collateral security."

\* \* \* \* \* \* \*

"If the parties agree that the right of an action on the original debt shall not be stayed, the surety will not be released. But in the absence of such agreement, the effect of taking the notes or bill, in the case of a pre-existing debt, is a suspension, and a consequent discharge of the surety. It is not for the surety to prove an agreement to stay the action, but for the *creditor* to show that by agreement the negotiable security does not entitle the debtor to forbearance. See *Armistead* v. *Ward,* 2 Pat. & H. [504]; *Blair & Hoge* v. *Wilson,* 28 Gratt. 165, 171, 173."

*Dey, Receiver* v. *Martin,* 78 Va. 1, under review, was a case in which interest in advance was paid by the maker of a note. Lewis, P., said:

"An agreement to give time to the principal gives rise to the presumption that the surety has been delayed or hindered in the use of his rights and remedies, which is absolutely conclusive, and cannot be overthrown by the most convincing proof that nothing has really been lost by the delay. *Green* v. *Biddle,* 8 Wheat. [U. S.] [1], 84 [5 L. Ed. 547]; 2 Daniel on Negotiable Instruments, section 1312."

These facts appear in *Stuart* v. *Lancaster,* 84 Va. 772, 6 S. E. 139. A note of the Greenbrier White Sulphur Springs Company, endorsed by Henry M. Matthews, R. A. Lancaster and William A. Stuart in the order named, was discounted by the Bank of Lewisburg, was not paid at maturity, was protested and lay under protest until January, 1882, when Stuart gave the bank a new note executed by himself and others. The bank continued to hold the original note. This new note was itself renewed, was paid by Stuart and, together with the original, was returned to him, all without Lancaster's knowledge or consent. Stuart then sought, without avail, to recover from Lancaster. The court, speaking through Lewis, P., said [page 141]:

"Now, while it is true that the defendant was not discharged from liability to the bank by the acceptance of the plaintiff's note, because it was not taken in payment of the original note, nor was the contract made with the *principal debtor* (*Frazer* v. *Jordan,* 92 E. C. L. 302; Story, Prom. Notes, 6th Ed., sec. 415;) yet, when that note was substituted by a new note of the principal debtor, the springs company, the bank impliedly agreed with the company, without the consent of the defendant, to give time on the original note, and thereby discharged the defendant from all liability as indorser on the note."

He further said:

"The truth is, strictly speaking, there was no pledging of the note as collateral at all; but it was simply held by the bank until the last note was paid, and at that time the defendant had been discharged."

*Callaway's Ex'r* v. *Price's Adm'r, supra,* was there cited with approval.

In *Cape Charles Bank* v. *Farmers' Mut. Exchange, Inc.*, 120 Va. 771, 777, 92 S. E. 918, there were no renewals at all and under review alone was the effect of interest paid in advance. It was held that it made out a *prima facie* case of extension but not a strong case, and that an agreement to explain this away and under which the surety will remain bound need not be express but may be implied from facts, declarations, and circumstances attendant upon the transaction.

These conclusions were sustained in *Heldreth* v. *Moore*, 153 Va. 156, 149 S. E. 473, 474. There, likewise, there were no renewals and interest was paid in advance.

We can readily understand why the payment of interest in advance may in certain circumstances be an ambiguous act and that recourse should be had to extrinsic evidence in determining its effect. But no one can successfully contend that the renewal of a note does not, upon its face, extend the time of payment. If this were not true, there would be no occasion to renew a note at all. The day after a renewal, and after the interest had been paid on it, the bank might bring suit on the old note. Plainly, the primary purpose of renewals is to postpone payday. If payday is postponed, the surety is released, "unless the right of recourse against such party is expressly reserved." It is not possible to misunderstand this statutory declaration, nor is it possible to believe that there was not an extension of time where a note due in 1930 was, by monthly renewals, kept alive until 1936. If there was any agreement or understanding which kept this note alive as to the endorser, the record does not show it. There is nothing to show that the parties in interest had this matter and its possibilities in mind until long after the original note fell due. The fact is that when this note first fell due, R. L. Harris' interest in his father's estate seemed to amount to at least $10,000. He, himself, was a man of affairs and cashier in a large national bank. That he might not be able to pay never occurred to anybody; nothing was said or done, and so the matter drifted.

It is true that R. L. Harris and A. E. Harris were given power to represent the devisees in the authorization of May 7, 1930. But they never, at any time, by remote suggestion undertook to advise the executor as to this note.

With no evidence before us except that of record, we reach the conclusion that there was no express reservation which kept alive this surety's obligation.

The contention of the bank is that by contract entered into between it and A. E. Harris, in his own right and as grantee of the devisees and heirs at law of J. M. Harris, deceased, all matters in dispute were settled. Under its terms the executor was to transfer to him all of the undisposed estate of his father, he, Harris, to pay to it $6,595.87, and that is the agreement which the second suit was brought to enforce. The court declined to enforce it and cross error has been assigned.

Out of these facts suggestions for a compromise settlement arose. A. E. Harris, as we have seen, had purchased from his father the father's home. At the date of the father's death, there was due on account of this purchase $4,000, secured by trust deed on the property purchased. The testator directed that these notes be cancelled. J. M. Harris was also guarantor of certain indebtedness due by A. E. Harris to Scott & Stringfellow, by reason of which the estate had to pay around $6,000. As time went on, its solvency became no longer certain. The executor was unwilling to cancel the purchase money notes of this son for the reason that one can not give away his property, by will or otherwise, at the expense of his creditors. A motion for judgment on them had been brought by the executor. The cordial relations which had existed between the executor and the heirs was measurably abated and dealings had become more at arm's length.

In June, 1934, Senator H. H. Watson, who was counsel for A. E. Epes, submitted to the executor a compromise settlement, the substance of which was that the executor was to turn over to him all of the decedent's estate, for which he was to pay something over $6,000. That proposition was

accepted, but the finality of it is a matter in dispute. Mr. Booker was asked: "Do you know why the final consummation of all the details and the preparation of the written agreement was delayed from in June up until in December?" He answered: "No, except that Mr. Watson wanted further time. Each time he said he was negotiating with the Home Loan in an effort to get a loan through for this particular purpose and which we had formerly promised cooperation." "Q. Was there also a delay in order to get a quitclaim deed from the brothers and sister of Mr. Harris so that the settlement with Mr. Harris would be complete and final?" He answered: "Yes, sir."

As indicative of Mr. Harris' attitude, it appears that two small dividend checks were sent to him by the Bank of Crewe on stock which he was to take under this settlement. The first of them he took to Mr. Watson and told him that he did not think that he had the right to accept it in that an agreement had not been reached. Mr. Watson told him: "It does not make any diffedence, if you do not reach an agreement, you can just return the money." The second check was returned directly to Mr. Booker.

In order to carry out the June agreement, Harris undertook to secure from the other heirs an assignment to him of their interest in the father's estate. This he did by deed of date August 15, 1934. That deed was executed and delivered to Harris; for it there was no consideration except that which was imported by seal.

On December 10, 1934, Mr. Harris' counsel, Senator Watson, and Mr. Freeman Epes met in the office of Mr. W. Moncure Gravatt. The character of these gentlemen in conference of itself indicated fair dealings and good faith. There is no dispute about what then took place. The matters in issue were again canvassed, differences were ironed out, and Mr. Gravatt then dictated to his stenographer the substance of the conclusions reached. It was reduced to writing and bears date December 10, 1934. Possibilities of securing a loan from the Home Owners Loan Corporation was discussed and the bank expressed itself as being willing

to carry the loan if necessary. Under it all of the assets of decedent's estate would be turned over to A. E. Harris, and he was to pay to the executor $6,595.87. Mr. Watson said:

"My idea about that was this: that Mr. Gravatt and myself at that time were anxious, if the agreement went through, to get the court to approve it and get through as quickly as possible. Mr. Harris stated, when I made this suggestion to him coming down the steps, that he was not going to do that, that he was not going to sign this agreement until he conferred with his wife, and I think he said Mr. Selden Harris."

He did consult with his brother Selden, who advised him not to sign. It, with a number of papers, was in Mr. Freeman Epes' office, all of which had to be signed in order to consummate the contract settlement. Mr. Epes told him to go on and sign this agreement, and if the matter did not go through, he could tear up the paper. The deed of August 15, 1934, was executed for the purpose of enabling A. E. Harris to complete his compromise settlement with the executor and should be read with it and as a part thereof. While it was delivered to A. E. Harris, it was a conditional delivery; should the settlement have fallen through, it could not properly have been recorded or retained.

On September 10, 1934, Mrs. Gillespie wrote to Epes, saying that she would forward the signed deed the next day, that her purpose in doing this was that he might secure a loan, pay off the bank, "and then immediately take action against our administrator to find out why the estate was handled in such a careless manner." On August 31, 1934, William J. Harris wrote that he was sending on the deed signed by his wife and himself. He said: "It is understood we are doing this in order that you may secure a loan * * * I hope after you secure your loan from the Home Owners Loan Corporation that you will get your obligations settled with the Citizens Bank & Trust Company and then enter suit against them and let us all see just what has become of the estate left in their hands to settle."

Selden, when he understood the situation, said to Mr. Free-man Epes, with whom the deed was: "I want my name off of it." The contract forever releases the executor from liability to the estate. These heirs thought that there had been negligence and mismanagement and were anxious for an accounting. Epes Harris, with this knowledge of the conditions under which the deed was delivered, would have misled its makers by the execution of a contract, which forever foreclosed any investigation of the executor's transactions.

It is perfectly true that a writing is not always necessary where specific performance is sought. Oral contracts may be enforced. Neither conferences which brought them about nor their conclusions need be evidenced by written memorials, but an enforceable contract must be a consummated contract; there must be a meeting of minds. If it be understood that its terms are to be reduced to writing as an ultimate expression of conclusions reached in a series of negotiations, then a writing is necessary.

It is further true that family settlements are favored, but this is not a family settlement but a settlement between the family and the executor. Contracts which relieve fiduciaries from giving accounts of their stewardships are not favored.

Again, specific performance can never be demanded as of right. It must appeal to the conscience of the chancellor, who has, within certain recognized limits, discretionary power. The granting of this equitable remedy is " * * * not absolute, like the right to recover a legal judgment. The granting the equitable remedy is, in the language ordinarily used, a matter of discretion, not of an arbitrary, capricious discretion, but of a sound judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each particular case." 4th Pomeroy's Eq. (3d Ed.) section 1404, where, among many cases cited, is that of *Hale* v. *Wilkinson*, 21 Gratt. (62 Va.) 75, where Moncure, P., said:

"It is true that the specific performance of contracts, in a general sense, is, as has been said, not a matter of right in either party, but a matter of discretion in the court; not, indeed, of arbitrary or capricious discretion, dependent upon the mere pleasure of the judge, but of that sound and reasonable discretion which governs itself, as far as it may, by general rules and principles; but, at the same time, which withholds or grants relief according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties."

A late case on this subject is *First Nat. Exchange Bank* v. *Roanoke Oil Co.*, 169 Va. 99, 192 S. E. 764.

We do not think the chancellor has abused the discretion vested in him.

We have only undertaken to discuss what appear to be matters of importance. To deal in detail with every objection made would make an opinion already too long unconscionably long and so content ourselves with saying that there is no reversible error in the record save and except that the executor should not take credit for the $2,894.91, paid on account of the R. L. Harris note, of date March 6, 1930.

The decrees appealed from are in all respects affirmed except in this one particular noted.

*Modified and affirmed.*