# Richmond.

## JONES'S ADMINISTRATOR ·V. JONES'S ADMINISTRATOR.

### FEBRUARY 13, 1896.

1. WILLS—*Case at Bar—Emancipation—Legacy to a Former Slave.*—A testator, by a codicil to his will, says: " I intended to give my negro man Bob his freedom; but in writing the foregoing will it escaped me." He then provides that " he (Bob) may elect to go to Liberia, or to the State of Ohio, and to be removed at the charge of my estate. If he elects to go to Ohio, I wish him to be sent to the neighborhood in which the executors of late William Ragland settled his negroes. I wish my brother to make a suitable provision for him. If he should not be willing to accept his freedom, I wish my brother, or my executors, to dispose of him at my death in such way as to secure to him a good and humane master, and to be paid annually a part of his earnings. He shall have the privilege of accepting his freedom at any period of his life, but to remain with my brother and to labor as a slave as long as he stays in the State." In a later codicil he says this man Bob has become disabled, and gives him an annuity of $50 during his life, and then adds: "I have given him his freedom, and, whether he accepts it or not, I give him this annuity in addition to the provisions in my will, to be paid to him whether free or not."

*Held :*

    The testator by his will emancipated his slave Bob, and he is entitled to the legacy bequeathed to him by the testator. The subsequent provisions of the will, by which the testator sought to create for him a condition intermediate between freedom and slavery, if he refused to accept his freedom, were void, and in no wise affected the bequest of freedom.

2. PERSONAL REPRESENTATIVES—*Trustees—Statute of Limitations.*—The personal representative of a decedent is deemed a trustee exercising a continuing trust as to legatees, and though he may rely on the staleness of the demand of a legatee, or upon any presumption of payment or satisfaction arising from lapse of time, yet the statute of limitations has no application to a suit by the legatee to recover his legacy.

Appeal from a decree of the Circuit Court of the city of Fredericksburg, pronounced May 15, 1893, in the chancery suit of *Waddy, for, &c.,* v. *Jones's Adm'r and Others.*
*Affirmed in part and reversed in part.*

Sarah A. Waddy, in her own right and as administratrix of Thomas C. Waddy, deceased, suing on behalf of herself and of all other creditors of Gabriel Jones, deceased, filed her bill in the Circuit Court of the city of Fredericksburg against the administrators of Gabriel Jones and Philip H. Jones and certain alienees of Gabriel Jones in his lifetime. The bill charges that certain conveyances and assignments made by Gabriel Jones in his lifetime were fraudulent as to his creditors, and that Gabriel Jones was a brother of Philip H. Jones and residuary legatee under his will. Copies of this will and of the several codicils thereto annexed were exhibited with the bill. The prayer of the bill was that the conveyance and assignments aforesaid might be set aside, that the estates of Gabriel Jones and Philip H. Jones might be administered under the direction of the court, and the debts of Gabriel Jones be paid out of the assets of his estate.

The necessary accounts were ordered during the progress of the cause, and the commissioner to whom the case was referred, in making his report in October, 1878, calls attention to the fact that Bob Jones is still alive, and claims an annuity of $50 for his life out of the estate of Philip H. Jones, under the provisions of his will, and that Bob has children who claim that, at Bob's death, they " are entitled to $50."

On November 29, 1878, Bob Jones filed his petition in the cause, claiming the annuity aforesaid, and his children also filed a petition, in which they claim that, under the provisions of the will of Philip H. Jones, deceased, they are entitled to the principal sum out of which the annuity issued, that is, not less than $833.33.

Upon the death of Bob Jones, in 1890, his administrator filed his petition in the cause, referring to the petition filed by Bob in his lifetime, and renewing the claim to the annuity theretofore asserted by Bob.

Upon the hearing both petitions were dismissed.

The other facts appear in the opinion of the court.

*A. L. Holladay*, for the appellant.

*Marye & Fitzhugh*, for the appellees.

BUCHANAN, J., delivered the opinion of the court.

The controversy in this case involves the construction of certain provisions in the will of Philip H. Jones, who died in the year 1856.

It is claimed by the appellants that the negro Bob, under the provisions of the codicils to the will, was made a free man, and entitled to a legacy of fifty dollars annually from the 1st day of December, 1856, (the time the will was admitted to probate,) as long as he lived.

If he acquired any rights under the will, they were never recognized by the executor or residuary legatee, so far as the record shows. Since 1865 he has been a free man. Whether made so by the will, or by the results of the civil war of 1861–5, is immaterial in this case, except so far as it affects his rights to the annuity heretofore referred to.

If the will did not make him a free man, he was not entitled to the annuity, as a slave could not take a legacy under a will, or otherwise acquire property.

Since his right to the annuity depends upon the question whether or not he was emancipated by the will, it will be necessary to construe its provisions so far as they affect this question.

The testator, in the first codicil, says: "I intended to give my negro man Bob his freedom, but in writing the foregoing will it escaped me." He then provides that "he (Bob) may elect to go to Liberia, or to the State of Ohio, and to be removed at the charge of my estate. If he elects to go to Ohio, I wish him to be sent to the neighborhood in which the executors of the late William Ragland settled his negroes. I wish my brother to make a suitable provision for him. If he should not be willing to accept his freedom, I wish my brother, or my executors, to dispose of him at my death in such a way as to secure to him a good and humane master, and to be paid annually a part of his earnings. He shall have the privilege of accepting his freedom at any period of his life, but to remain with my brother and to labor as a slave as long as he stays in the State."

In the third codicil he states that his man Bob has become disabled, and gives him an annuity of $50 during his life, and provides how it shall be paid. He then adds: "I have given him his freedom, and, whether he accepts it or not, I give him this annuity in addition to the provisions in my will, to be paid to him whether free or not."

In construing these provisions of the will, we have as a guide not only the language of the testator, but also his declaration of what he intended to do when he wrote them, and of what he had done after they had been written.

As the object of construction is to ascertain the intention of the testator, his declarations, when contained in the will, of what he intended to do, or had done by the language used, ought to control, and be conclusive of his intention, unless it be manifest that no such construction can be placed upon it.

In *Elder* v. *Elder*, 4 Leigh 252, 261, President Tucker said: "However, or by whatever words, the intention is expressed, that intention must prevail, for there is no prescribed form in which the benevolent design to emancipate a

slave is required to be expressed." 2 Minor's Inst. (4th ed.) 1055.

The testator having declared, before he wrote the first codicil, that he intended to free his slave Bob, and having declared, as he closed the third codicil, that he had given him his freedom, is there anything in the language used by which he undertook to accomplish that end, and by which he thought he had accomplished it, which will prevent the court from holding that such was his intention? If there is not, then it is clear that the intention of the testator was to manumit his slave.

It is claimed that the true construction of the language used was to give Bob his right to elect to be free or to remain in slavery. And not being able as a slave, under the decisions in the cases of *Bailey* v. *Poindexter*, 14 Gratt. 132, and *Williamson, &c.* v. *Coalter*, 14 Gratt. 394, to make such election, the provisions of the will were inoperative, and he continued to be a slave.

We do not think that this case presents the same question that was decided in those cases, but, if it did, we would not consider those decisions as precluding us from a re-examination of that question, since they are in conflict with the prior decisions of this court during a period of more than fifty years; were decided by a bare majority of the court, two judges dissenting in each case, and are so contrary to reason and to justice that we would hesitate long before we would hold that a slave could not elect to be free when that right was given him by his owner.

The testator had the power to manumit his slave, or to continue him in slavery, but he could not make provisions for his occupying an intermediate position between freedom and slavery. The law recognized no such condition, and the courts have uniformly declared such provisions void. If the will made him free, conditions limiting that freedom were

void ; if it did not make him free, but gave him rights which a slave could not exercise, they were also void.

In this case, after the testator had given the slave his freedom, as he thought and intended, he adds : " If he should not be willing to accept his freedom, I wish my brother, or my executors, to dispose of him in such a way as to secure to him a good and humane master, and to be paid annually a part of his earnings. He shall have the privilege of accepting his freedom at any period of his life, but to remain with my brother and labor as a slave as long as he stays in the State." It is apparent from the provisions quoted that the testator did not intend that his man Bob should continue to be a slave after his (the testator's) death. On the contrary, if he was unwilling to accept the freedom which had been given him, the testator directed his brother, or his executors, to dispose of him in such a way as to secure to him a good and humane master, and to see that he was paid annually a part of his earnings. By this provision it is clear that there was no authority given them to sell him, for then his earnings, as well as himself, would be the property of the new owner, and they would have no control over either. The next sentence in the will shows still more clearly that the testator did not intend that he should be sold, nor be the property of anyone, for it provides that he shall have the privilege of accepting his freedom at any period of his life, " but to remain with my brother and to labor as " (not be) " a slave as long as he lives," and to receive from his brother a part of his earnings. Neither of these provisions gave the brother, nor the executors, any property in him. They were clothed with certain powers over him, and certain duties to him were imposed upon them ; but the powers given were not those of ownership, nor were the duties imposed such as a slave could enforce.

In the case of *Osborne* v. *Taylor*, &c., 12 Gratt. 117, the provisions of the will were very similar to those we are now

considering. The will in that case contained the following clause :

"At the death of Mrs. Caroline M. P. Johnson, it is my further will and direction that the slaves embraced in this item be emancipated, and one-fourth of the property which Mrs. Johnson may not dispose of at her death, as required in item sixth, be distributed amongst them as may be deemed most equitable by my executors. But should a part or the whole of the negroes prefer remaining in the State, they can do so by choosing masters to serve during the life of the person or persons chosen, at the death of whom they shall have the option of freedom or slavery by making a second choice."

In that case it was insisted that the slaves were left in a condition of slavery at the death of Mrs. Johnson, and that until they elected to be free they continued to be slaves. The court in reply to that contention said : "This part of the objection is founded upon a misapprehension of the will. The counsel construe the will as directing that the slaves shall remain such until they elect to become free ; whereas the will, in a substantive clause, distinctly manumits them, and afterwards, in another clause, gives them the election to remain in the State,. in a condition intermediate between slavery and freedom. The latter alternative is against the settled policy of the law, and has no effect. *Forward's Adm'r* v. *Thamer*, 9 Gratt. 537." Judge Allen, who delivered the opinion of the majority of the court, in *Williamson, &c.* v. *Coalter, &c.*, 14 Gratt., at page 402, in commenting upon the decision in the case of *Osborne, &c.* v. *Taylor*, and distinguishing it from the case he was then considering, said : "But I do not entertain any doubt as to the correctness of the construction placed upon the clause of the will then under consideration. It conferred absolute freedom, with a bequest of property to them ; and then a provision was inserted amounting in fact

to no more than a suggestion of a mode by which the negroes, if they preferred remaining in the State, could do so, by choosing not owners, but masters, to serve during life, and at the death of the master they were to have the option of freedom or slavery by making a second choice. The absolute property was vested in no one. It was not contemplated that the slaves preferring to remain should remain the property of the testator's estate. The masters to be successively chosen were to have but a limited interest. They could neither sell nor bequeath them, but, in consideration of services, were to support and protect them. This was a qualified condition of slavery, which the testator could not create, nor could the slaves do so by any election on their part. The testator intended to emancipate, to extinguish all property in them as slaves; but suggested an option which was merely nugatory after freedom attached."

We are of opinion that the testator in the case at bar intended to and did emancipate his slave Bob, and that the subsequent provisions of his will, by which he sought to create for him a condition intermediate between freedom and slavery, if he refused to accept his freedom, were void, and in no wise affected the bequest of freedom.

It is claimed, however, by the appellee, that the party claiming the annuity in this cause has not shown that he was the slave Bob, to whom it was given, and, if he were the same person, he is not entitled to recover because of his *laches* in asserting his claim, and because it is barred by the statute of limitations.

The creditors of Gabriel Jones, after his death, instituted suit against his personal representative, and the personal representative of Philip H. Jones, deceased, and others, for the administration, among other things, of the two estates. This suit was instituted in April, 1878.

In November of the same year Bob Jones filed a petition

in that cause, alleging that he was the Bob mentioned in the will; that he was entitled to the annuity of $50 from December 1, 1856, the time the will was admitted to probate; that he was manumitted by the will, but had no opportunity or power to become actually free until after the thirteenth amendment to the Constitution of the United States was adopted; that he had received no part of his annuity, and asked for its payment.

The case seems to have progressed very slowly. In May, 1885, however, the commissioner of the court, to whom the former account taken in the case had been recommitted, made his report, in which he stated that "before the creditors of Gabriel Jones, deceased, are entitled to anything from the estate of Philip H. Jones, all debts and demands outstanding against the last-named estate should be paid." And then adds: "And there is one claim against said estate which has never been adjusted, namely, the claim of Bob Jones to an annuity of $50.00 *per annum*, under Philip H. Jones's will. It is not here necessary that your commissioner should give a statement of the facts in the case, as they are fully set out in Bob's petition, and the note of argument filed by his counsel in the case. Bob was a negro slave, who was the property of Philip H. Jones."

In May, 1890, Bob having died, his administrator filed his petition, setting out the fact that his decedent had died, and containing substantially the same allegations that were contained in the petition filed by Bob himself. To this the administrator of Philip H. Jones filed his answer, denying the allegations of the petition, and pleaded the statute of limitations.

The statute of limitations cannot be relied upon to defeat this legacy. The personal representative of a decedent is deemed a trustee, exercising a continuing trust as to the legatees and distributees of his decedent's estate. In such

cases the statute of limitations has no application. *Leake,* &c. v. *Leake,* &c., 75 Va. 792, 802.

Such fiduciary can, however, rely upon the staleness of the demand, or upon any presumption of payment or satisfaction arising from lapse of time. But there is nothing in this case to prevent the legatee from asserting his claim. He was kept in slavery and deprived of both his freedom and the bequest to which he was entitled until the year 1865. The stay law was in existence until the 1st day of January, 1869. His petition was filed in the year 1878 in this suit, which was instituted in part for the purpose of settling up the estates from which his annuity was due.

Neither is there any doubt upon the whole record that the petitioner, Bob Jones, was the man Bob who was emancipated by the testator. Commissioner Anderson had reported in 1886 that Bob, the petitioner, was the slave of the testator, and that his annuity had never been adjusted. This report, except in certain particulars which do not affect this question, was confirmed by the court in 1886.

The only question that seems to have been really controverted in the court below was the question of law involved in the construction of the provisions of the will. The facts found by the administrator's report as to Bob's identity seem to have been acquiesced in in that court, nor are they very earnestly controverted here. We think that the record shows clearly the identity of the petitioner.

The petition of the children of Bob Jones was properly dismissed. The sum directed to be set apart by the last codicil of the will of Philip H. Jones, to secure their father's annuity, was not given to them after their father's death, as they claim, but was given to the children of Charles S. Jones.

The decree of the Circuit Court, in so far as it dismissed the petition of the children of Bob Jones, must be affirmed, but in so far as it dismissed the petition of Bob Jones and

the petition of his administrator it must be reversed, and this court will enter such decree as that court ought to have entered.

*Affirmed in part and reversed in part.*