# Richmond

PACKARD NORFOLK, INCORPORATED v. M. J. MILLER.

November 26, 1956.

Record No. 4564.

Present, Hudgins, C. J., and Eggleston, Spratley, Miller and Whittle, JJ.

The opinion states the case.

*Edward S. Ferebee,* for the appellant.

*Joseph E. Baker* and *M. R. Broudy* (*Broudy & Broudy,* on brief), for the appellee.

MILLER, J., delivered the opinion of the court.

■ On May 10, 1955, H. J. Miller filed a suit in equity against Packard Norfolk, Incorporated, hereinafter called Packard, to cancel a written contract dated February 26, 1955, the pertinent parts of which appear in the margin,[1] under which Miller had purchased from Packard a sedan automobile. Miller alleged that he had been induced to purchase a new 1955 Packard automobile under false, fraudulent and material representations.

The chancellor granted the prayer of the bill, cancelled the contract, and ordered Packard to refund the purchase price of the car. We granted Packard an appeal.

The testimony was heard *ore tenus,* and all conflicts in the evidence and just inferences deducible therefrom have been resolved in favor

---

[1] "The front and back of this Order comprise the entire agreement affecting this purchase and no other agreement or understanding of any nature concerning same has been made or entered into, or will be recognized * * * I have read the matter printed on the back hereof and agree to it as a part of this order the same as if it were printed above my signature * * *"

The reverse side of the contract:

"7. It is expressly agreed that there are no warranties, express or implied, made by either the dealer or the manufacturer on the motor vehicle, chassis or parts furnished hereunder except as follows:

"The manufacturer warrants each new motor vehicle (including original equipment placed thereon by the manufacturer except tires), chassis or part manufactured by it to be free from defects in material or workmanship under normal use and service. Its obligation under this warranty being limited to making good at its factory any part or parts thereof which shall, within ninety (90) days after delivery of such vehicle to the original purchaser, or before such vehicle has been driven 4,000 miles, whichever event shall first occur, be returned to it with transportation charges prepaid and which its examination shall disclose to its satisfaction to have been thus defective; this warranty being expressly in lieu of all other warranties expressed or implied, and all other obligations or liabilities on its part, and it neither assumes nor authorizes any other person to assume for it any other liability in connection with the sale of its vehicles. This warranty shall not apply to any vehicle which shall have been repaired or altered outside of an authorized service station in any way so as in the judgment of the manufacturer to affect its stability, and reliability, nor which has been subject to misuse, negligence or accident.

"The dealer agrees to install any part or parts furnished under the manufacturer's warranty above on the motor vehicle covered in this order without charge to the owner of such motor vehicle."

of Miller. The chancellor's factual finding is entitled to the same weight as a jury's verdict. *Worrie* v. *Boze,* 191 Va. 916, 62 S. E. 2d 876.

With all conflicts in the testimony resolved in favor of Miller, the evidence upon which the contract was cancelled may be summarized as follows:

Miller is a physician who has practiced his profession in Norfolk since 1927, and he purchased the car for professional use and pleasure purposes. During previous years he had bought two Packard cars from this company and had experienced trouble with them, and he was somewhat reluctant to acquire another car of the same make. A few days prior to consummation of the sale, when John R. Sandy, Packard's salesman, called on Miller at the latter's office in an attempt to make sale of the car, Miller apprised the agent of his unsatisfactory experiences with the other cars. At this interview he told the agent that he wanted "the car to be absolutely in as good running condition as it can, with everything perfect and thoroughly checked." The agent assured him "that the car was an improvement over previous models, * * * would have more power, * * * more pick up" and "that for the first time the Packard had a V-8 motor and that a V-8 high speed motor would give * * * more power." Miller then stated to the agent that he was not sure that he wanted to get a car and that maybe he had "better let them try the Eight first." To that Miller said the agent responded as follows: "[T]hat I might rest assured that these motors have been tested for six months prior to any car being put on the market * * * that I should not fear trouble, and to rest assured that I would have no further trouble with anything else, that the car would be in perfect condition, * * * thoroughly checked * * * gone over carefully, * * * [and] in as good running condition as it could be when it was delivered to me. I told him that only under those circumstances would I even consider buying another Packard car."

Upon being asked if he would have purchased the car if the agent had not represented to him that it was "in perfect running condition," he replied: "I wouldn't; I would not have even considered buying a car unless I had definite assurances that they were going to stand behind it."

F. W. Dunn, called as a witness by Miller, was asked what conversation was had between Miller and the salesman on February 25, 1955, (that being the day the sale was actually made though the

contract is dated February 26) just before the sale was closed and he answered as follows:

"A. Mr. Sandy told Dr. Miller that the car was in first class condition, he was sure he would have no trouble with it. Dr. Miller told Mr. Sandy that if the car were not in first class condition he would be glad to wait until they put it in first class condition. * * *"

Though the car did not run smoothly when first driven by Miller, he then attributed that condition to its newness. The first trouble of moment was experienced on March 2, 1955, when the mileage on the car registered 180 miles. On that occasion Miller had an emergency professional call but was unable to start the car although he tried for half an hour to get it to operate. When Huston R. Powell, Packard's service manager, came to examine the automobile, he found the automatic choke blades stuck and that the car needed water. When taken to the shop, a rubber hose connection was found to be perforated and was replaced. Upon return of the car that night to Miller, it was vibrating, making loud noises, and ran with difficulty. The next day, March 3, the car was returned to the shop, and after further examination Packard's mechanic agreed that the motor was making noises; a valve rocker arm was found to be worn and had to be replaced. The trouble could not be immediately repaired because the needed parts were not then available, but on the following day Miller was told that the car was ready for delivery. However, when it was started, it made a whistling sound "almost like a police siren," did not run smoothly, and the valves were tapping. Miller advised salesman Sandy that he would not accept it. Packard's service manager then made some adjustment that toned down the whistling but the car still did not run smoothly. At Powell's suggestion to take the car "out and run it and bring it back" if it did not run properly, Miller drove away but had difficulty starting the car. Thereafter he continued to have difficulty in starting the car, and when in operation it felt as if it were bumping over rough places in the road, lacked pick-up and would buck, particularly on inclines if the driver "put a little power on it." The car was left with Packard on six or seven different times to have them correct the defects, and Miller says that in the thirty days that he kept the car, he did not have one day of perfect driving. What Miller described as a broken valve lift was replaced and still the car did not perform properly, and it was returned to Packard on March 25, and several hours thereafter Pack-

ard's service manager advised Miller that all the car needed was to be run about 70 to 75 miles per hour.

During the time the car was driven the first five hundred miles it was missing, bucking and lacked power, and when the speedometer registered 548 miles, the spark plugs were replaced but this did not correct its sluggishness; that was still evident at a reading of 800 miles.

While this unsatisfactory condition existed, the car lost an unusual amount of oil, and Miller was advised by the service manager that the car would probably lose oil until it had been driven 3,000 miles or more and that the loss of oil might be as much as a quart every hundred miles. He attributed this loss to the fact that the car had chrome piston rings which had not become seated and which he said took longer to get seated than cast iron rings. Miller testified that he was told by the service manager that "until they get seated, the car is going to lose oil, and when it loses oil, it won't fire properly." When Miller complained that the salesman had not advised him of any such condition, Powell replied, "He didn't know it but I knew it * * * because I spent two weeks at the factory studying this new model car even before they put it on sale * * * I noticed that and I called their attention to the fact * * * that the car would lose oil. * * * I know you have had a whole lot of trouble with the car * * * but there isn't anything I can do about it."

On March 28, 1955, Miller returned the car to Packard and demanded refund of the purchase price.

The evidence sustains the conclusion that the salesman believed that the statements he made to Miller were true. However, they were untrue, and if they were representations of material facts and relied upon by the purchaser to his damage, the salesman's belief that they were true is of no avail.

"Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other it is actual." *Jefferson Standard Life Insurance Co. v. Hedrick*, 181 Va. 824, 834, 27 S. E. 2d 198.

"For though the representation may have been made innocently, it would be unjust to allow one who has made false representation, even innocently, to retain the fruits of a bargain induced by such representation." 3 Williston: *Sales* (Rev. ed.), pp. 435, 436.

"The intent of the party making the representation is wholly immaterial. The point is, has the other party been misled? It is sufficient that the statement is actually untrue, so as to mislead the

party to whom it is made. The party making it need not know of its falsity, nor have any intent to deceive; nor does his mere belief in the truth make any difference. A party making a statement as true, for the purpose of influencing the conduct of the other party, is bound to know that it is true." *Wilson* v. *Carpenter*, 91 Va. 183, 189, 190, 21 S. E. 243.

Miller contends that the statements made by the salesman, especially that made at the former's office a few days before the sale was consummated "that the car would be in perfect condition * * * thoroughly checked * * * gone over carefully * * * [and] in as good running condition as it could be when delivered to me * * *" were material representations of an existing fact which were false and which induced him to purchase the car to his damage.

Packard asserts that the car was in perfect condition at the time of delivery, and if not, that all defects and objectionable conditions had been cured and removed before it was returned by Miller.

We cannot agree with Packard's assertion. The proved facts and reasonable inferences deducible therefrom fully sustain the chancellor's finding that the car was not in perfect condition when the statement was made or when the car was delivered, but was subject to material defects and imperfections. In fact, it was never in good running condition during the thirty days that it was shuttled back and forth between Miller's home and Packard's service department.

Packard further contends that the above quoted representations were made several days before the sale, were expressions of opinion promissory in nature, and were not statements as to an existing fact and were not material. It argues that Sandy's statement made in the presence of Dunn just before the sale was consummated is the sole representation as to the condition of the car at that time, and that statement is not claimed by Miller to have been a moving inducement of the purchase.

"There is no certain rule by the application of which it can be determined when false representations constitute matters of opinion or matters of fact, but each case must in a large measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances." 23 Am. Jur., Fraud and Deceit, § 28, p. 784.

"It is not always an easy matter to determine whether a given statement is one of fact or opinion. The relative knowledge of

the parties dealing, their intentions and all of the surrounding circumstances, which can only be gathered from the evidence, affect the interpretation which the courts put upon representations in determining whether they be of fact or opinion." *Garrett* v. *Finch*, 107 Va. 25, 28, 57 S. E. 604. 8 M. J., Fraud and Deceit, § 10, p. 702.

The statement made to Miller at his office, was made by the salesman for the purpose of inducing Miller to buy and by the statement the salesman intended to convince Miller that the automobile was then in perfect running condition and would be in that condition when delivered.

A statement asserting the then perfect condition of a new car is a representation as to the present quality or character of the article and is clearly a representation of fact and not a promise as to something to be done in the future. Whether or not a car is in the condition represented is factual, not promissory.

Under the circumstances, it is clear that the representation was intended to be understood as a statement of an existing fact that would continue to exist when the car was delivered, and was not a mere opinion as to the car's quality or a promise of what would be performed in the future.

 Was the statement material?

"One of the fundamental principles which pervades jurisprudence involving fraud and the maintenance of actions or defenses based thereon is that to constitute fraud in any case the facts misrepresented or concealed must have been material facts which substantially affect the interests of the person alleged to have been defrauded. According to the majority of courts which have attempted to lay down criteria of materiality, a fact is material when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." 23 Am. Jur., Fraud and Deceit, § 111, p. 892, 8 M. J., Fraud and Deceit, § 7, p. 699.

The statement made by salesman Sandy to Miller at the latter's office and that made on February 25 in Dunn's presence fully justify the conclusion that Miller was induced to buy primarily by what he was told in his office. Though the statement made on February 25 immediately preceded the sale, Packard loses sight of the fact that Miller, after recounting what was said to him at his office, testified that "only under those circumstances would I even consider

buying another Packard car." This testimony of Miller's clearly means that it was only upon Sandy's factual representations that this was a perfect car, and would be in that condition when delivered, would he consider purchasing another Packard automobile. Clearly the representations were of a material fact.

Finally Packard asserts that the statement that the car was "in perfect condition" cannot be availed of by Miller in this action because (1) it is specifically excluded by the sales contract, (2) it is a mere warranty, and (3) it purports to cover the identical subject provided for in the express warranty.

We cannot agree that the false representation which induced the contract has no legal consequence because the contract provides that "the front and back of this order comprise the entire agreement effecting this purchase and no other agreement or understanding of any nature concerning same has been made or entered into, or will be recognized." Nor do we find the legal import of the statement that the car was in perfect condition to be a mere warranty.

Because of the fraud practiced in the procurement of the contract, the entire instrument—the whole contract—is rendered voidable at the instance of the defrauded party. At his election the quoted provision as well as all other provisions of the contract are voided for no *binding* contract ever came into existence. A seller may not rely upon and claim the benefits of a contract and at the same time through that instrument contract against and relieve himself of the consequences of his fraud that induced the other party to enter into the contract.

The quoted provision in the instrument is evidence tending to disprove Miller's contention but it cannot render unimpeachable a contract obtained by fraud. The statement that the car was "in perfect condition" was more than a warranty. It was more fundamental for it was the representation of an existing fact that was material and untrue.

Nor does the express agreement between Packard and Miller that there "are no warranties express or implied made by the dealer or manufacturer * * *" (except the manufacturer's ninety day or four thousand mile warranty) and that "the manufacturer warrants each new motor vehicle * * * chassis or parts manufactured by it to be free from defects in material or workmanship * * *" or the further provision in paragraph No. 7 that "this warranty being expressly in lieu of all other warranties, express or implied, and all other obliga-

tions or liabilities on its part * * *" insulate the dealer from the legal consequences of fraud practiced by its agent to obtain the challenged contract.

In *White Sewing Machine Co.* v. *Gilmore Furniture Co.*, 128 Va. 630, 639, 640, 105 S. E. 134, White sued Gilmore for $1,500 on a written contract. In defense Gilmore alleged fraud in the procurement of the contract and cross-claimed for damages. Sustaining a verdict awarding damages to Gilmore on the cross-claim, the court said:

"Coming specifically to the clause purporting to exclude all agreements or understandings with the sales agent, we repeat that the Gilmore Company is not relying upon the collateral understanding or agreement, which merely imposed an obligation upon Massy (Complainant's sales agent), but is relying upon his false representations as agent of the White Company which induced the contract of purchase. This clause does not refer to false and fraudulent representations of fact, and if it did would be unavailing, because a principal cannot by any such clause or other device relieve himself of the consequences of the fraud of his own agent, while claiming the benefit of such contract. The door cannot thus be closed on fraud, nor can it remain buried if there be any way to unearth it."

Of like effect is *International Harvester Co. of Am.* v. *Bean*, 159 Ky. 842, 169 S. W. 549.

Here ample opportunity was afforded Packard to fulfill its obligation and remedy the defects by putting the car in the perfect condition it was represented to be in by the salesman as an inducement to effect the sale. That was not done and Miller was told by the service manager that he was sorry "but there isn't anything I can do about it." The express warranty, which purports to be "in lieu of all other warranties" does not render the seller immune from fraud that induced the contract. The warranty stands no higher than the contract which is vitiated by the fraud. The fundamental legal right to avoid a contract induced by fraud may not be nullified by a provision in the contract, the effect of which would make the purchaser abide the contract and seek a less effectual remedy.

The facts proved measure up to the requisite needed to avoid a contract for fraud in its procurement as stated in *Jefferson Standard Life Insurance Co.* v. *Hedrick, supra*, at page 833,

"If one represents as true what is false, in such a way as to induce a reasonable man to believe it, and the representation is meant

to be acted upon and he to whom the representation is made, believing it to be true, acts on it, and thereby sustains damage, there is ground to support an action of deceit at law, and to found a rescission of the transaction in equity."

In *C. E. Wright & Co.* v. *Shackleford,* 152 Va. 635, 643, 148 S. E. 807, involving avoidance of a contract to sell a car because of alleged fraud, the facts were quite similar to those presented in this record, and there we said:

"That fraud, as a matter of fact, was practiced, is plain. The car, when delivered, was not in perfect condition, did not run smoothly, and this the salesman knew. It is likewise plain that the defects in the clutch and piston were material. It follows that the complainant would be entitled to relief, had he proceeded with promptness to repudiate his purchase."

When the defects were not remedied, Miller acted with reasonable promptness to avoid the contract.

We find no error in the decree appealed from, and it is

*Affirmed.*