### Richmond

## Alma S. Kitchen, Et Al.

## v.

## Shirley S. Throckmorton, Administrator, Etc., Et Al.

January 22, 1982.

Record No. 790755.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

166

*John W. Pearsall (McCaul, Grigsby & Pearsall,* on briefs), for appellants.

*A. James Kauffman (Leonard A. Paris; Randolph P. Tabb, Jr.; White, Cabell, Paris & Lowenstein; Taylor, Hazen, Kauffman, Lipscomb & Smith,* on brief), for appellees.

HARRISON, R.J., delivered the opinion of the Court.

In this suit Alma S. Kitchen and other beneficiaries of the estate of Alexander H. Swan, deceased, alleged that the administratrix of the estate flagrantly disregarded her fiduciary duty and fraudulently distributed the estate in a manner contrary to law and in violation of an agreement to which she was a party. Plaintiffs sought, *inter alia,* a recovery from her, or the surety on her bond, of certain attorneys' fees, commissions, and other payments alleged to have been wrongfully made by the administratrix, and asked for a proper distribution of the decedent's estate. The court below struck the evidence upon the ground that plaintiffs had not proved fraud of the administratrix by clear, cogent, and convincing evidence, or proved that she had deviated from the standard of care and competence required of her in the performance of her duties.

During his lifetime, Alexander H. Swan accumulated a small estate which consisted principally of money on deposit in several Richmond banking institutions. In 1968, his wife, Marie, was in Westbrook Hospital. Being desirous of providing for her security, and apparently having more confidence in his nephew, William E. Swan, than other members of the family, Alexander placed his money in joint accounts with William. Alexander entered into an oral agreement with William whereby, in the event Alexander died before Marie, the wife would be properly cared for out of the funds. The parties further agreed that William, upon the deaths of both Marie and Alexander, would apply the money in a certain manner. After payment of Alexander's debts, distribution of the estate was to be $3000 to Ouida S. Adcock, William's sister, $3000 to Shirley S. Throckmorton, Alexander's niece, and the remainder in four equal parts to Alexander's brother, Frederick W. Swan, his sister, Alma S. Kitchen, his sister-in-law, Carrie Swan, and William.

Marie Swan died first, and thereafter Alexander died on May 9, 1971. The family had been fully advised of the arrangement

that Alexander had made with William as to the manner in which the decedent's estate was to be distributed by William, acting as his trustee. Indeed, all persons who were the heirs-at-law of Alexander, as well as those whom the decedent directed to share in his estate, signed, sealed, and acknowledged a written agreement dated July 16, 1971, in which they recited that although Alexander died intestate, they "were aware of his wishes as to how his estate should be distributed" and desired "to carry out the wishes of the decedent."

William verified the various balances that were in their joint accounts in the banks and savings and loan associations in Richmond and transferred the funds to the Farmers National Bank in Appomattox, a bank near his home and one with which he dealt. Dewitt Evans, president of the Farmers National Bank, testified that on June 4, 1971, when the funds were transferred from Richmond to his bank, they were placed in a "special account." William advised him that the money was not to be placed in, or commingled with, his personal account. The money was accordingly deposited in a "special account" to "William E. Swan and/or Gracie T. Swan or the survivor." Allegedly the deposit was made in this manner so that in event of William's death before he could make distribution in the manner directed by Alexander, his wife could carry out the wishes of the decedent. Contemporaneous with the deposit, and at the suggestion of Mr. Evans, William signed a memorandum to this effect.[1]

William testified that he advised his uncle, Frederick W. Swan, of the manner in which Alexander's estate was being handled and that he was preparing to distribute the money according to Alexander's wishes. William had paid some of the debts of the decedent, including $1796 which represented the final nursing home bill of Alexander. He stated that this payment was questioned by Frederick and his daughter, Shirley S. Throckmorton. William further testified that Frederick demanded that William pay Shirley $5000 instead of $3000 and that later Frederick also demanded a check of $17,000 for himself from the estate. William said that he refused these demands and told Frederick and Shirley that he would settle the estate only according to the instructions given him by Alexander.

---

[1] The memorandum was prepared by Williams' wife and is dated June 4, 1971. It was offered in evidence and rejected by the trial court.

The next development was the appointment by the Chancery Court of the City of Richmond of Shirley S. Throckmorton as administratrix of Alexander's estate. This was done on June 9, 1971, but not on motion of the plaintiffs. She then filed in that court a bill of complaint and affidavit, alleging that William had "wrongfully converted to his own use" and taken possession of the entire estate of Alexander H. Swan. Upon her motion, the court entered orders enjoining William and the banks from disbursing or withdrawing any monies in the accounts. When advised of her action, William consulted John R. Snoddy, Jr., then a practicing attorney in Buckingham, and sought his advice and guidance.

Snoddy testified that William advised him of his agreement with Alexander and the action he had taken following Alexander's death. Soon thereafter, Snoddy conferred with Howard C. Vick and Robert E. Pembleton, counsel for Throckmorton. Subsequently the parties readily agreed to sign an agreement for the estate to be distributed exactly as Alexander had directed William.[2] The agreement is dated July 16, 1971, and directs the administratrix to pay "all debts, administration expenses, taxes and legitimate claims against said Estate." After such payment, Throckmorton was to deliver a 1964 Chevrolet automobile to William, pay $3000 each to Ouida S. Adcock and Shirley S. Throckmorton, and pay the balance in equal shares to Alma S. Kitchen, Carrie R. Swan, William E. Swan, and Frederick W. Swan. On August 15, 1971, William delivered to the administratrix all property and funds he had in his possession under his agreement with Alexander.

Snoddy testified that upon the execution of the July 16, 1971 agreement, he felt that the entire matter had been resolved. In his opinion nothing further remained to be done, prior to distribution, other than the entry of an order confirming the agreement since the estate was not being distributed in accordance with the statute of descent and distribution. He said Throckmorton's attorneys agreed to prepare such an order. Snoddy said he did not file an answer or response to Throckmorton's suit in chancery court because: "It was agreed when we entered into the agreement that it would not be necessary and that everything had been worked out

---

[2] William agreed to the sale of a coin collection and a watch with the proceeds being made part of the estate. These items had been given William by the decedent prior to his death.

and that this agreement would be ratified by the Court and that would be the disposition of the matter."

Snoddy further testified that the administratrix failed to make distribution to his clients until June 21, 1972, at which time he received a copy of a "first and final accounting of the estate of Alexander H. Swan," along with three checks for $5,682.63 each, payable to William E. Swan, Carrie R. Swan, and Alma S. Kitchen. Ouida S. Adcock had previously received a check for her $3000. Snoddy noted from the account that the administratrix had paid out over $17,000 in attorneys' fees. He said that he had been told by the attorneys for the administratrix that their fee would be reasonable and that the court would set it. And he added that no mention had ever been made to him of any contingent 33⅓% attorneys' fee agreement, and he did not know it existed.

The grossly diminished shares tendered his clients, which they refused, prompted Snoddy to go to Richmond and examine the file in the suit brought by Throckmorton. He said that he then learned for the first time that on the day Throckmorton was appointed administratrix, June 9, 1971, she signed an authorization for Robert E. Pembleton to act as her attorney in her claims against William E. Swan and others liable to the estate of Alexander H. Swan. She agreed that as compensation for his services he would be paid 33 ⅓% of the "proceeds of any recovery, whether obtained as a result of suit or compromise" and that in addition she would reimburse Pembleton for any sums paid by him for investigation, preparing her claims for trial, and court costs. Neither Snoddy nor his clients had been advised of this contract of employment or of its terms.

Snoddy further discovered that on August 12, 1971, Throckmorton had personally petitioned the court to approve her contract of employment with Pembleton and Howard C. Vick to "represent her in an attempt to recover and conserve assets of the Estate of A. H. Swan." She and her two attorneys asked for, and the court entered, an order approving and ratifying the contract. No copy of the July 16, 1971 agreement was filed with her petition or with any other pleading in the suit. The record does not show that the Chancery Court of the City of Richmond was ever advised of the agreement or asked to determine a reasonable fee to be paid for legal services rendered the administratrix.

Thereafter, Alma S. Kitchen, William E. Swan, Corrine S. Kidd, Doris S. Rosser, Ouida S. Adcock, Gladys S. Kesterson,

Hugh Swan, and Carrie R. Swan filed their bill of complaint in the court below against Shirley S. Throckmorton, Administrator of the estate of Alexander H. Swan, deceased, and United States Fidelity and Guaranty Company, surety on her bond. Mrs. Kitchen is the decedent's sister. Mrs. Carrie Swan is the widow of decedent's brother and the mother of William Swan, Hugh Swan, Corrine Kidd, Doris Rosser, Ouida Adcock, and Gladys Kesterson. Their appeal was filed upon the entry by the court below of the final decree striking the evidence and denying the relief prayed for in their bill and amended bill.

The issue in this case is whether the testimony introduced by the plaintiffs made a prima facie showing that the administratrix of Alexander's estate was guilty of the gross mismanagement thereof, and whether her action constituted constructive fraud on the court and the complaining parties.

The law which controls our decision here was well-stated in an opinion by Mr. Justice Eggleston, later Chief Justice, in *Jackson* v. *Seymour,* 193 Va. 735, 741-42, 71 S.E.2d 181, 185 (1952), where it was said:

> In *Moore* v. *Gregory,* 146 Va. 504, 131 S.E. 692, we quoted with approval this definition of constructive fraud as written in 26 Corpus Juris, Fraud, § 4, p. 1061 (now found in 37 C.J.S., Fraud, § 2-c, pp. 211, 212): " 'Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud.' " (146 Va. at page 523.)

Shirley S. Throckmorton was not only the administratrix of the estate of Alexander W. Swan, charged with its administration in the manner provided by law, she was also, in effect, a trustee of Alexander and obligated to distribute his property in accordance with her written agreement with those entitled thereto.

In *Virginia Trust Co.* v. *Evans,* 193 Va. 425, 433, 69 S.E.2d 409, 414 (1952), this Court said:

The personal representative of a decedent holds a position of trust and confidence. He is "deemed a trustee, exercising a continuing trust as to legatees and distributees of his decedent's estate." *Jones* v. *Jones,* 92 Va. 590, 598, 24 S.E. 255. He must exercise the highest fidelity and utmost good faith in dealing with the estate. In the discharge of his fiduciary obligations, he is required to use the same measure of care which a careful and prudent person would ordinarily use under like circumstances in his own personal affairs. *Harris* v. *Citizens Bank, etc., Co.,* 172 Va. 111, 200 S.E. .652; 21 Am. Jur., Executors and Administrators, § 4, page 370; 33 C.J.S., Executors and Administrators, § 184, page 1160.

It is not enough for Throckmorton and her counsel to respond that she administered or handled the affairs of the estate "to the best of her ability." Her duty was that of a fiduciary. Neither can the administratrix here absolve herself of the moral and legal responsibilities of a fiduciary by shifting the blame to her counsel.

The evidence is clear that Alexander Swan wanted William to look after his affairs. He gave William very explicit directions for the maintenance of his wife, payment of debts, and the division of the remainder among six named relatives. His mental competency is nowhere questioned. He arranged his bank accounts so that after his death the money could be withdrawn by William and handled and disbursed by this nephew in whom he had complete confidence. Before William could carry out his agreement with Alexander, or determine if the appointment of an administrator was necessary, controversy developed involving Frederick and his daughter, Shirley. William testified that they demanded more than he was instructed by the decedent to give them, and he refused their demands. It was then that Throckmorton began a course which frustrated the decedent's wishes and depleted the estate drastically. We find nothing in the testimony of the plaintiffs to show that William ever appropriated, or intended to appropriate, any portion of the estate, or had any intention of handling it in any manner other than as directed by the decedent, whether he acted as a trustee or administrator.

Throckmorton's bill of complaint filed against William is significant, not only in that it charged William with wrongful conversion, but also in that it alleged that Alexander died intestate and ignored the decedent's oral agreement with William of which she

had knowledge. This leads a reader to believe that she was seeking to recover the estate's assets in order to distribute them according to the laws of descent and distribution. A careful examination of the papers in the suit shows that this impression was never corrected. Upon the affidavit and representation of the administratrix that an emergency existed and that "irreparable harm" would be suffered by the estate, the court enjoined William from dealing in any way with the property of the estate. Subsequently, on August 12, 1971, the court directed William to turn over to the administratrix all funds and property of Alexander in his possession. William had already agreed in writing on July 16, 1971, to do just that, but this information was withheld from the court.

The order of the court approving the employment of Pembleton and Vick as counsel for the administratrix, asked for by Throckmorton and the attorneys, uses the language "to locate and recover assets belonging to said Estate [that of Alexander H. Swan, deceased]." Plaintiffs argue that the court would not have entered this August 12 order had it known the estate was to be distributed according to the executed agreement of July 16. The language used by the court in this order clearly suggests it thought the estate was to be distributed according to the laws of intestacy. It is not conceivable that the court would have approved a 33 ⅓% fee "to locate and recover assets" had it been told that all parties involved in the estate knew in which banks the money was located, who was handling it, and to whom it was to be paid. The failure of the administratrix to advise the court of the agreement amounted to withholding information which the court should have considered when it was asked to ratify the employment contract between the administratrix and her attorneys.

Had the administratrix distributed the estate according to the laws of descent and distribution, she would have received commissions only. The course she pursued was one which greatly augmented her share in the estate. She thereby received the $3000 that the decedent desired her to have. In addition, she received $2625 as commission, which was paid at the expense of the other beneficiaries.

The testimony shows that William and his attorney were not unduly disturbed by the appointment of Throckmorton as administratrix because she and the other parties agreed for the estate to be distributed as the decedent wished. However, their attitude would undoubtedly have been different had they known at that

time that the administratrix had agreed to pay over $17,000 to attorneys to recover assets that William held and was preparing to distribute. The concealing of this contract from the plaintiffs for approximately a year, and until after the final accounting, was a breach of her duty of loyalty to the beneficiaries.

An examination of the "first and final accounting" which the administratrix furnished Snoddy the latter part of June 1972, is most revealing. A copy is appended to this opinion. It shows a gross estate of $52,689.35. On August 17, 1971, five days after the court had approved her attorneys' employment, and just two days after she obtained control of Alexander's money, she paid the attorneys $17,670.29. This was allegedly paid pursuant to the court order of August 12, 1971, and, in addition to being excessive, is $107.17 more than the 33 ⅓% provided by the contract. On the same day, the administratrix wrote herself a check for $2000 on account of administratrix's fee. Later, on January 17, 1972, she paid her attorneys an additional $250 for "legal services to administratrix" and paid herself an additional $625.30 commission. The total amount received by the administratrix and the attorneys is $20,545.

The record shows that Throckmorton withdrew the sum of $3400 from a bank account of the decedent subsequent to his death, but later refunded it to the estate. This item is shown on the account as "Robert E. Pembleton, escrow account." Amazingly, she not only collected a 5% commission on this sum, but the attorneys also collected one-third thereof, presumably for uncovering, or recovering, the $3400 from their client, the personal representative. Equally as amazing is the payment to the attorneys of one-third of the amount which the administratrix realized from the sale of United States bonds, income tax refund, sale of a coin collection, refund of an overpayment to a hospital, and social security payments, which amounts were not "recovered or uncovered" by the attorneys for the benefit of the estate.

The administratrix points to the transfer of money from the Richmond banks and its deposit by William in a special account in the Appomattox bank as justification for the injunctive action she took as administratrix. We are not convinced this argument has merit. The money involved in this estate belonged to Alexander Swan. He could do with it as he wished. He did not see fit to make a will or to select either Frederick or Shirley Throckmorton to manage his affairs. He desired that his business be managed by

William, not only during his and his wife's lifetime but after his death as well. It was William whom the decedent trusted and to whom he gave directions for distributing his property. It was therefore not unreasonable that William should conclude that his wife was the one person who would most likely carry out the wishes of the decedent, in event of his own death before distribution. This was a decision which was peculiarly one to be made by William, and one which the decedent, by creating joint bank accounts prior to his death, made possible.

■ Defendants also comment on the failure of Snoddy to file answer on behalf of his clients in the suit brought by the administratrix. Snoddy's explanation is that soon after being consulted by William, it was agreed that the estate be settled as the decedent desired, and as William intended to settle it. The agreement was reduced to writing, signed, and acknowledged, and Throckmorton's attorneys advised Snoddy that their fee would be reasonable and would be fixed by the court. The administratrix had given bond with corporate surety. Nothing further remained for Snoddy to do but await a distribution by her to his clients. He says he understood that since the estate was to be distributed according to the June 16, 1971 agreement, this document would be lodged with the chancery court. There was no reason for Snoddy to anticipate a breach of this duty by Throckmorton and her attorneys.

Further, Snoddy's uncontroverted testimony revealed that Throckmorton's attorneys had agreed that no response to the bill was necessary. Notwithstanding this agreement, the August 12, 1971 chancery court order, prepared and asked for by counsel for the administratrix, emphasizes that the bill was taken as confessed as to William and that he failed to appear or file responsive pleadings. This alleged failure by Snoddy was then used as justification for not sending him a copy or securing his endorsement of the final order entered by the chancery court on September 22, 1971. Of more significance is Snoddy's testimony, again without contradiction, that he never received copies of the two orders entered on August 12, 1971, approving the attorneys' employment contract and ordering William to deliver the estate to Throckmorton.

In the instant case, the trial court heard the testimony of two defense witnesses after defendants' motion to strike was made and while it had the motion under consideration. However, the court recited in its final order that it was striking plaintiffs' evidence. It

should therefore have resolved any doubt as to the sufficiency of the evidence in plaintiffs' favor. *Jones* v. *Downs,* 222 Va. 25, 278 S.E.2d 799 (1981). We are of the opinion that under the plaintiffs' evidence they are entitled to equitable relief on the ground of constructive fraud, and that such relief is within the scope of the allegations of the original bill of complaint as amended.

■ In her fiduciary capacity, Throckmorton, whether acting as a personal representative or under the agreement, had the duty to meet the standard set out in Code § 26-45.1. She was required to exercise "the judgment of care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs." The evidence makes out a prima facie case that Throckmorton did not meet this standard, and that her handling of the estate was such as to perpetrate a constructive fraud upon the court and the Swan beneficiaries. Irrespective of her moral guilt, and whatever was her intent, the law declares the breach by her of her legal and equitable duty to be fraudulent because of its tendency to deceive others, to violate public or private confidences, and to injure public interest. Throckmorton must be held to an objective standard of fiduciary responsibility.

The evidence does not permit a reasonable inference that Throckmorton was merely a victim or an unwitting tool of her attorneys, Vick and Pembleton. The inequities that have resulted from her administration of the Swan estate, paraphrasing the language of Lord Thurlow in *Gwynne* v. *Heaton,* 1. Bro. Ch. 1, 9; 28 Eng. Rep. 949, 953 (1778), "[are] so strong, gross and manifest that it must be impossible to state [them] to a man of common sense without producing an exclamation."

Being of opinion that the trial court erred in granting the motion to strike the plaintiffs' evidence, we will reverse the judgment of the lower court and remand the case for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

FIRST AND FINAL ACCOUNTING
THE ESTATE OF ALEXANDER H. SWAN, DECEASED
BY SHIRLEY S. THROCKMORTON, ADMINISTRATOR

RECEIPTS

1971

| | | |
|---|---|---:|
| 6/25 | Sale of U.S. Bonds | 278.88 |
| 6/30 | Income Tax Refund | 82.83 |
| 8/17 | Farmers National Bank of Appomattox | 48,001.36 |
| 8/17 | Robert E. Pembleton Escrow Account | 3,400.00 |
| 9/15 | First & Merchants National Bank | 131.81 |
| 9/15 | Sale of coin collection, watch, bowl and ring | 365.00 |
| 10/28 | St. Mary's Hospital — Refund of overpayment | 113.27 |
| 11/2 | U.S. Government — Social Security | 61.20 |
| 12/31 | U.S. Government — Social Security death benefits | 255.00 |
| | | $52,689.35 |

DISBURSEMENTS

1971

| | | |
|---|---|---:|
| 7/30 | Bank Service Charge | 1.03 |
| 8/17 | Allied Ambulance Service, Inc. — Service to A. H. Swan on 4/29/71 and 5/8/71 | 67.50 |
| 8/17 | St. Mary's Hospital — Last illness | 114.07 |
| 8/17 | Dr. Adney K. Sutphin — Medical services of last illness | 138.60 |
| 8/17 | West End Orthopaedic Clinic | 45.00 |
| 8/17 | Stratford Hall Nursing Home | 1,796.09 |
| 8/17 | W. A. Hartman — Engraving on grave marker | 12.50 |
| 8/17 | Robert E. Pembleton and Howard C. Vick, Attorneys — Fee as per Court Order of 8/12/71 | 17,670.29 |
| 8/17 | Shirley S. Throckmorton — Costs advanced: Court costs $50.00, Clerk's fee for qualification $5.00, death certificates $6.00 | 61.00 |
| 8/17 | Shirley S. Throckmorton — Payment on account of administrator's fees | 2,000.00 |
| 8/20 | Dunkum's Funeral Home | 364.21 |
| 8/20 | Robins Insurance Agency, Inc. — Bond for Administrator | 190.00 |
| 8/20 | E. E. Warriner, Clerk of Chancery Court — City tax and Clerk's fee | 102.32 |
| 8/25 | McDonald Wellford, Commissioner of Accounts — Commissioner's fee and fee of clerk for recording | 3.00 |
| 9/10 | Howard C. Vick — Fee for sale of coin collection and watch | 56.34 |
| 9/20 | Ouida S. Adcock and John R. Snoddy, her attorney — Payment in accordance with agreement of 7/16/71 | 3,000.00 |
| 9/20 | Shirley S. Throckmorton — Payment in accordance with agreement of 7/16/71 | 3,000.00 |
| 9/23 | Bureau of Vital Statistics — 2 copies of death certificate | 4.00 |

| | | |
|---|---|---:|
| 11/18 | E. E. Warriner, Clerk of Chancery Court — Additional Clerk's fee | 44.00 |

1972

| | | |
|---|---|---:|
| 1/17 | Howard C. Vick — Legal services to Administrator | 250.00 |
| 1/17 | Shirley S. Throckmorton — Balance of fee to Administrator | 625.30 |
| 1/21 | Treasurer of Virginia | 309.10 |
| 1/21 | E. E. Warriner, Clerk — 1 copy of order and authorization to act as attorney | 2.50 |
| | | $29,856.85 |

SCHEME OF DISTRIBUTION:

| | |
|---|---:|
| To McDonald Welford — Commissioner of Accounts | 102.00 |
| To Alma S. Kitchen per agreement of 7/16/71 | 5,682.62 |
| To Carrie R. Swan per agreement of 7/16/71 | 5,682.62 |
| To Frederick W. Swan per agreement of 7/16/71 | 5,682.63 |
| To William E. Swan per agreement of 7/16/71 | 5,682.63 |
| | $22,832.50 |

/s/ SHIRLEY S. THROCKMORTON
Shirley S. Throckmorton
Administrator

STEPHENSON, J., dissenting.

The majority finds Throckmorton guilty of fraud because of her failure to disclose the existence of the attorneys' fee agreement to the appellants and her failure to disclose the settlement to the Richmond Chancery Court. However, in order to constitute fraud, the facts concealed "must have been material facts which substantially affect the interests of the person alleged to have been defrauded." *Packard Norfolk* v. *Miller,* 198 Va. 557, 563, 95 S.E.2d 207, 211 (1956). I do not find any evidence of materiality and would therefore affirm the decision of the trial court.

An examination of the record reveals that the appellants were asked no questions regarding the fee agreement. Thus, not only is there no evidence that their knowledge of the agreement would have prevented them from executing the settlement, there is no evidence that they were ignorant of the fee agreement. It is not for the Court to speculate what the appellants knew or what they might have done.

Nor does the evidence indicate that the judge who ratified the fee contract would have acted differently had he known of the settlement agreement. The only testimony given by the judge was that he did not see a written copy of the settlement agreement at the time the fee contract was approved. There was no evidence of what took place at this proceeding, of what facts the judge was aware, or of the effect of this awareness on his decision. The majority states that "it is not conceivable" that the court would have approved the fee if it had known of the settlement agreement. Once again, however, this is speculation. Materiality is a fundamental element of fraud, and the burden was on the appellants to produce some evidence of it. They have failed to do so, and the trial court properly struck the appellants' evidence.

COMPTON, J., joins in dissent.